461 S.E.2d 451

Rex JIVIDEN, Executor of the Estate of Delvious Jividen, Plaintiff Below, Appellant,

v.

Robert LAW and Joyce Law, Defendants and Third–Party Plaintiffs Below, Appellees,

v.

Paul KOVACS, Barbara Kovacs, and William Penn Home Farm, Third–Party Defendants Below, Appellees,

and

Rex JIVIDEN, Executor of the Estate of Delvious Jividen, Plaintiff Below, Appellant,

v.

Paul KOVACS, Barbara Kovacs, and William Penn Home Farm, Defendants and Third–Party Plaintiffs Below, Appellees,

v.

Robert LAW and Joyce Law, Third–Party Defendants Below, Appellees.

No. 22513.

Supreme Court of Appeals of West Virginia.

Submitted May 9, 1995.

Decided July 11, 1995.

Steven M. Recht, Arthur J. Recht, William E. Galloway, Weirton, for appellants.

John P. Davis, III, Jones, Gregg, Creehan & Gerace, Pittsburgh, PA, for appellee, William Penn Home Farm.

J.P. McMullen, Jr., Charles D. Bell, Wellsburg, for appellees, Paul and Barbara Kovacs.

Michael G. Gallaway, Jeffrey A. Holmstrand, McDermott, Bonenberger, McDermott & Gallaway, Wheeling, for appellees, Robert and Joyce Law.

WORKMAN, Justice:

This wrongful death action arises out of the events leading to the demise of Delvious Jividen (hereinafter the "decedent"). The decedent's executor, the Appellant Rex Jividen, appeals from an order of the Circuit Court of Brooke County granting summary judgment to the Appellees, Robert and Joyce Law, Paul and Barbara Kovacs, and the William Penn Home Farm (hereinafter the "Home"). While the Appellant's brief sets forth a plethora of errors, he essentially asserts that the circuit court (1) applied the wrong standard of care to the Appellees; and (2) ignored or improperly resolved certain genuine issues of material fact. Finding no error in the circuit court's ruling, we hereby affirm.

## I. FACTUAL DEVELOPMENT

The Home is located in Wellsburg, West Virginia. While it was formerly a personal care facility, it was closed for financial reasons at the end of February 1991. At all times relevant, the Home was owned by the William Penn Association, a fraternal non-profit organization. Mr. Kovacs was employed by the Home and served as its administrator. Mrs. Kovacs was the Home's business and office manager and performed various bookkeeping duties.

On January 26, 1988, the Laws leased approximately ninety-five of the Home's 565 acres with the intention of raising hay and possibly field corn on the property. The lease agreement contained provisions which mandated (1) that the barn be available to the Home (and presumably its employees);[1] (2) that the Laws permit the Home to maintain five horses in the barn; (3) that the Laws furnish the Home with 500 bales of hay; and (4) that the Laws purchase the Home's remaining head of cattle. Mr. Law purchased all but three of the cattle. While there is some dispute, for purposes of summary judgment we must assume that these

---

1. The common area used by the Home and the Laws did not appear to be limited to just the barn. The president of the William Penn Association, Elmer E. Vargo, agreed during his deposition that "the barn *area* … [was] common ground[.]" (Emphasis added). The common ground between the parties, then, would presumably include the barn itself and the area immediately surrounding it. We assume for purposes of

remaining three steers were purchased from the Home by the decedent.[2]

On September 28, 1988, the decedent came to the Home to collect the three steers and met Mr. and Mrs. Law. At the time of the decedent's visit, Mrs. Kovacs' registered quarterhorse colt, Keno,[3] was present in a corral adjacent to the barn pursuant to the above-described lease agreement. Keno was apparently corralled to facilitate the healing of injuries that he sustained when he ran into a barbed wire fence a couple of days prior to September 28. This was apparently the first time that the colt had been either corralled or away from its mother for an extended period. According to Mr. Law's deposition, the decedent was aware of Keno's leg injury and how it occurred.

Shortly after the decedent arrived, the Laws decided to place the three steers into the corral adjacent to the barn. This was the same corral where Keno was being kept. From there, the parties intended to back a loading trailer to the gate in the corral's fence and then, via a loading ramp, move the three steers into the trailer. Prior to moving the steers into the corral, however, Mr. Law testified that a halter was placed on Keno and that Mrs. Law took the colt out of the corral a short distance away. The steers and some other cattle were then herded into the corral.

Just prior to loading the steers, however, Mr. Law testified that Keno began pulling back on the rope that Mrs. Law was holding. According to the record, both Mr. Law and the decedent appear to have noticed that Keno was not being entirely cooperative with Mrs. Law. As a result, both men then ap-

proached Keno, and Mr. Law jerked the colt's rope and calmed him. The decedent then apparently took the rope and held onto Keno thereafter.[4] Mr. and Mrs. Law then commenced moving the trailer into position to load the cattle. While there is some confusion in the record, we will assume for purposes of summary judgment that Keno kicked the decedent.[5] The decedent was rushed to the hospital with, among other things, a fractured skull and blunt chest injuries. He died a few days later.

The Appellant originally filed a wrongful death action against the Laws in April 1990. In September 1990, the Appellant filed a virtually identical complaint against the Kovacs and the Home. Additionally, the Laws and the Kovacs filed third-party complaints against each other. Discovery proceeded and the Appellees filed motions for summary judgment. The Appellees pointed to evidence in the record which indicated that Keno had never demonstrated any vicious or dangerous propensities prior to attacking the decedent and that, consequently, the Appellees could not have predicted or reasonably foreseen such an uncharacteristic attack. The Appellant countered, however, by submitting (1) the statements of Mr. and Mrs. Law that Keno was a bit frisky; (2) a statement from a relative of the decedent who testified that Mr. Law told her that Keno was a "rambunctious … wild colt;" (3) a statement by Mr. Law that Keno preferred to "run and play" rather than being penned; and (4) a one-page affidavit from an expert. The circuit court granted summary judgment to the Appellees because, inter alia, "[n]o

---

this appeal that the accident in question occurred on common ground.

2. The Appellant asserts, consistent with Mr. Law's testimony, that the decedent purchased the three steers from the Home. One steer was purchased by the decedent directly from the Home via a payment to Mr. Kovacs. The remaining steers were acquired when the decedent paid Mr. Law, who in turn gave the money to Mr. Kovacs. We note that the Home generally disagrees with this characterization.

3. According to Mrs. Kovacs, the name "Keno" was apparently a "barn name." The colt's registered name was Leo Spanish Sunset.

4. While the extent of his knowledge is somewhat disputed, the record reflects that the decedent was well-acquainted with horses generally. For instance, the Appellant himself testified that the decedent maintained his own team of horses for farm work for approximately 10 years.

5. There appears to have been an initial dispute as to whether the decedent's injuries were caused by the vehicle driven by Mr. Law or Keno's hoof. The Appellant's expert, Dr. Jesse Rinaldo, testified that "I thought the injuries were more consistent with being kicked by a horse than by being injured by a moving vehicle." Given this testimony and its underlying explanation, we will assume that Keno was responsible for the decedent's injuries.

evidence ... [was] ... found in the extensive discovery process ... indicat[ing] that Keno was dangerous, vicious or had any predisposition toward violent behavior."[6] The Appellant then pursued the instant appeal.

In our view, the principal issues on appeal are whether the circuit court (1) applied the wrong standards of care to the Appellees; or (2) ignored or improperly resolved certain genuine issues of material fact. A discussion of each issue and related sub-issues are set forth below.

## II. LEGAL ISSUES

### A. The Applicable Standards of Care:

According to the Appellant, our existing case law dealing with the applicable standards of care for injuries caused by domestic animals has engendered some confusion. Indeed, the law of torts as it relates to animals has often generated uncertainty, in part, due to " 'a pot-pourri of specialised rules of mediaeval origin.' " P.M. North, *The Modern Law of Animals* 1 (1972) (commenting on the common law generally and stating additionally that " '[t]he law of torts has grown up historically in separate compartments and

... beasts have travelled in a compartment of their own.' ") (quoted sources omitted); *see Duren v. Kunkel*, 814 S.W.2d 935, 937 (Mo.1991) (en banc) ("Rules imposing liability for harm caused by domestic animals find their origin in authority no less ancient than the Pentateuch.") With rare exception, we have applied two separate yet coexisting causes of action in cases involving injuries occasioned by domesticated beasts.[7]

The first cause of action is represented by cases such as *Johnston v. Mack Manufacturing Co.*, 65 W.Va. 544, 64 S.E. 841 (1909). In *Johnston*, a farmer's boar attacked a neighbor. We stated in syllabus point one, in part, as follows: "The owner and keeper of a boar is not liable for a personal injury inflicted by him, *unless it appear that he was vicious, and that such owner and keeper had previous knowledge of his vicious propensity..*.." *Id.*, Syl.Pt. 1, in part, (emphasis added).

In other words, *Johnston* held that in order to impose liability on an owner or keeper of a domestic animal for injuries caused by the animal, it was necessary to prove two elements: (1) that the animal had a danger-

---

**6.** The Appellant and some family members of the decedent would likely have agreed with this statement shortly after the incident occurred. For instance, Mr. Kovacs testified that the Appellant and the decedent's stepson visited the Home a couple of days after the incident. Both individuals looked at Keno, petted him, and "said it was evident that the horse was a docile type of horse."

There is additional evidence in the record which demonstrates that Keno was uncharacteristically gentle. For instance, the four year-old son of Stephen Danko, the president of the William Penn Association, was once led around while seated on Keno's back. An exhibit to Mr. Kovacs deposition also states as follows:

This colt was examined by two different veterinarians, both of whom commented on the horse's kind and gentle disposition. This horse also was tended to by a blacksmith every other week until he was a year and a half old. This blacksmith is also prepared to attest to the good disposition of the colt. Recently the colt was sold to an experienced, horse-owning family for the use of their 12-year-old daughter. They have since informed us that the horse has been very easy to train and is extremely gentle.

**7.** We note the Appellant's assertion that the circuit court erred in ruling as a matter of law that Keno more closely approximated a domestic

rather than a wild animal. The Restatement (Second) of Torts § 506 (1977) provides as follows:

(1) A wild animal as that term is used in this Restatement is an animal that is not by custom devoted to the service of mankind at the time and in the place in which it is kept.
(2) A domestic animal as that term is used in this Restatement is an animal that is by custom devoted to the service of mankind at the time and in the place in which it is kept.

*Id.*

While we are aware of authority on both sides of the issue, we think the better view is held by those courts who uniformly treat horses as domestic animals. *See, e.g., Moessinger v. Johnson,* 292 So.2d 606, 607 (Fla.Dist.Ct.App.1974) (stating that a horse is "a domesticated animal ... [and] is presumed not to be vicious or dangerous."); Annotation, *Liability of Owner of Horse to Person Injured or Killed When Kicked, Bitten, Knocked Down, and the Like,* 85 A.L.R.2d 1161, 1162 (1962) (stating in part that "a horse, being a domestic animal, is presumed not to be dangerous to persons....") Indeed, one is hardpressed to think of any other animal besides the horse that has more traditionally been "devoted to the service of mankind." *See* Restatement, *supra* at § 506(2). Consequently, we discern no error in the circuit court's determination.

ous or vicious propensity, and (2) that the owner or keeper had actual or constructive knowledge of the propensity. *See also* Syl. Pt. 1, *Butts v. Houston,* 76 W.Va. 604, 86 S.E. 473 (1915). Thus, scienter is a critical component of this first cause of action.[8]

■ A case that is representative of the second cause of action is *Dawson v. Woodson,* 180 W.Va. 307, 376 S.E.2d 321 (1988). *Dawson* involved an ordinary negligence action which arose out of injuries sustained by the plaintiffs when the defendant's horse jumped a pasture fence, ran along a public road, and caused a car accident. *Id.* at 309, 376 S.E.2d at 323. In syllabus point four, we stated, in part, that "an injured party may maintain a claim for damages if that party establishes that the animal owner failed to exercise the *ordinary care* that was necessary to prevent injury to others." *Id.* at 308–09, 376 S.E.2d at 322–23 (emphasis added).[9]

In *Dawson,* however, we added the following important caveat to this principle: " 'What ordinary care demands depends always upon the circumstances of the case, and a primary factor among those circumstances is the fact whether the injury could or could not have reasonably have been anticipated from the acts done or left undone by the defendant.' " *Id.* at 311, 376 S.E.2d at 325 n. 2 (quoting *Drew v. Gross,* 112 Ohio St. 485, 491, 147 N.E. 757, 758 (1925)); *see also*

*Drake v. Dean,* 15 Cal.App.4th 915, 925, 19 Cal.Rptr.2d 325, 331 (1993) ("In determining the keeper's liability for negligence for injuries inflicted by a domestic animal, the criterion usually adopted is one of reasonable anticipation of the occurrence, i.e., foreseeability."); *Trager v. Thor,* 445 Mich. 95, 106, 516 N.W.2d 69, 75–76 (1994) (quoting *Arnold v. Laird,* 94 Wash.2d 867, 871, 621 P.2d 138, 141 (1980) (en banc) (" 'The amount of control required is that which would be exercised by a reasonable person based upon the total situation at the time, including the past behavior of the animal and the injuries that could have been reasonably foreseen.' ")).

■ Based on the *Johnston* and *Dawson* lines of cases, our existing authority can be easily reconciled. Where a domestic animal injures one who is lawfully in the place where the injury occurs, the injured party can pursue two causes of action for damages against the owner or keeper of the animal.[10] The first action is one for strict liability, and it may be maintained where the injured party can show that (1) the animal had a dangerous or vicious propensity, and (2) the owner or keeper had actual or constructive knowledge of that propensity. If the injured party cannot prove either of the above elements, he or she may still maintain an ordinary negligence action if it can be shown that the owner or keeper failed to exercise the ordinary care that was necessary to prevent the

---

8. We gave some indication in *Johnston* and in subsequent cases that the scienter cause of action sounded in negligence rather than strict liability. For instance, in *Marcum v. Bellomy,* 157 W.Va. 636, 203 S.E.2d 367 (1974), we discussed West Virginia Code § 19–20–13 (1931), which imposes liability on dog owners and keepers for injuries that occur while their canine is running at large. *See* W.Va.Code § 19–20–13 (1993). We stated that "[b]efore the passage of this statute, the rule in West Virginia was that it was necessary to prove *negligence* on the part of the dog owner by demonstrating that the owner knew or should have known that the dog had vicious proclivities in order to recover for a dog bite." 157 W.Va. at 639, 203 S.E.2d at 369 (emphasis added). In our view, however, the better approach is to impose strict liability on an owner or keeper when the two *Johnston* elements are demonstrated. To the extent that we have not explicitly utilized this approach previously, we now adopt it for all future cases. Accordingly, we hereby disavow statements such as those made in *Mar-*

*cum* that the scienter action sounds in negligence.

9. In *Butts* and *Dawson,* we suggested that questions of both (1) scienter and (2) ordinary care are factual determinations that should be made by the jury. The mere fact that a particular cause of action contains elements which typically raise a factual issue for jury determination, however, does not automatically immunize the case from summary judgment. The plaintiff must still discharge his or her burden under West Virginia Rule of Civil Procedure 56(c) by demonstrating that a legitimate jury question, i.e. a genuine issue of material fact, is present. *See infra.*

10. The Home and the Laws even dispute whether they can be classified as either owners or keepers of Keno. Given our ultimate disposition, however, we need not resolve this question. Rather, without deciding the issue, we will assume that both Appellees are properly characterized as owners or keepers.

injury. In the latter case, however, liability will not attach unless the injured party can demonstrate, with particular emphasis on the animal's past behavior and characteristics, that the injury could reasonably and foreseeably have been anticipated by the defendant. One can readily ascertain, at least in the case of *attacks* by domestic animals, that the knowledge and foreseeability analysis under both causes of action will often overlap to some extent.

Our two-pronged approach is similar, if not identical, to that utilized in the Restatement (Second) of Torts. Restatement (Second) § 509 (1977) provides, in part, as follows:

> (1) A possessor of a domestic animal that he knows or has reason to know has dangerous propensities abnormal to its class, is subject to liability for harm done by the animal to another, although he has exercised the utmost care to prevent it from doing the harm.

*Id.* By its terms, this section imposes strict liability for injuries caused by a domestic animal resulting from the animal's dangerous propensities of which the possessor knew or had reason to know. In regard to negligence, Restatement (Second) of Torts § 518 provides, in pertinent part, as follows:

> Except for animal trespass, one who possesses or harbors a domestic animal that he does not know or have reason to know to be abnormally dangerous, is subject to liability for harm done by the animal if, but only if,
>
> . . . .
>
> (b) he is negligent in failing to prevent the harm.

*Id.* Comment (f) to § 518 states, in part, that "[t]he amount of care that the keeper of a domestic animal is required to exercise in its custody is commensurate with the character of the animal." *Id.*

While some courts have recognized only the strict liability cause of action, a number of other jurisdictions and commentators have utilized the two-pronged approach. *See, e.g., Drake,* 15 Cal.App.4th at 924, 19 Cal.Rptr.2d at 330 ("The common law recognizes negligence as a distinct legal theory of recovery for harm caused by domestic animals that

are not abnormally dangerous."); *Trager,* 445 Mich. at 105, 516 N.W.2d at 75 ("Negligence actions in domestic animal injury cases have been recognized by the Court of Appeals, usually as an alternative theory of liability to a strict liability claim when scienter cannot be shown."); *Duren,* 814 S.W.2d at 938 ("Defendant's position is that the owner of a domestic animal is immune from liability in the absence of actual or constructive knowledge of the animal's abnormally vicious propensities, even though the owner was in some respect negligent. That is not the law."); *DeRobertis v. Randazzo,* 94 N.J. 144, 156, 462 A.2d 1260, 1266 (1983) ("If either the dog is not vicious or the owner does not know of its vicious propensities, then negligence, not absolute liability, applies."); *Dunnings v. Castro,* 881 S.W.2d 559, 562 (Tex.Ct.App.1994) ("Dunnings contends that even though the court found the bull was not vicious and did not display any tendency to be vicious, it did not preclude the court from considering whether there was any negligence on the part of the employer. We agree with Dunnings' analysis."); *Arnold,* 94 Wash.2d at 870, 621 P.2d at 140 ("[We have never held that] . . . there cannot be both an action based upon negligence and one based upon common law "strict liability"); 3 Fowler V. Harper et al., *The Law of Torts* § 14.11 at 268–69 (2d ed. 1986) ("If there is not notice of the ferocious nature of the animal, the owner may, of course, still be liable for negligent keeping, but the basis of liability in the two cases must be sharply distinguished."); 3 J.D. Lee & Barry A. Lindahl, *Modern Tort Law Liability & Litigation* § 37.06 (rev. ed. 1990) ("An owner or keeper may be liable for injuries resulting from a failure to exercise reasonable care in keeping an animal."); *see also Loder v. State,* 200 A.D.2d 925, 927, 607 N.Y.S.2d 151, 153 (1994).

Having set forth our dual approach as it relates to injuries by domestic animals, we now turn to the question of whether summary judgment was properly granted in the instant case.

*B. The Summary Judgment Standard*

In *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994), we clarified our view of

summary disposition, in part, to disabuse litigants and circuit courts of the erroneous notion that West Virginia Rule of Civil Procedure 56 had ceased to exist. In that same vein, we recently stated that "[t]o the extent that our prior cases implicitly have communicated a message that Rule 56 is not to be used, that message, hereby, is modified." *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 58, 459 S.E.2d 329, 335 (1995) (emphasis added).[11] Rule 56 was incorporated into West Virginia civil practice for good reason, and circuit courts should not hesitate to summarily dispose of litigation where the requirements of the Rule are satisfied.

■ The applicable standards for disposition of a summary judgment motion are now well-settled. Under Rule 56(c), summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no *genuine issue* as to any *material fact* and that the moving party is entitled to a judgment as a matter of law." *Id.* (emphasis added).[12]

■ We summarized the non-movant's burden under Rule 56(c) earlier this term:

If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of material fact,

the burden of production shifts to the non-moving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.

Syl.Pt. 3, *Williams*, 194 W.Va. at 56, 459 S.E.2d at 333 (emphasis added). Further, in relation to (1) and (2) above, the non-moving party must, at a minimum, offer more than a "scintilla of evidence" to support his or her claim. *Id.*

■ Roughly stated, a "genuine issue" is simply one half of a "trialworthy" issue, and a genuine issue does not arise "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Williams*, 194 W.Va. at 59–60, 459 S.E.2d at 336–37. Stated another way, "[i]f the evidence favoring the nonmoving party is 'merely colorable ... or is not significantly probative'" a genuine issue does not arise, and summary judgment is appropriate. *Williams*, 194 W.Va. at 60–61, 459 S.E.2d at 337–38 (quoting *Anderson*, 477

**11.** Prior to the liberalization of summary judgment practice and procedure that was spawned by a trilogy of decisions handed down by the United States Supreme Court in 1986, federal district courts also expressed an unwillingness to grant Rule 56 motions. For instance, one commentator states as follows: "[T]he Fifth Circuit ha[d] been traditionally seen as so quick to reverse grants of summary judgment that one district judge in New Orleans posted a warning sign, 'No Spitting, No Summary Judgments.'" Robert M. Bratton, *Summary Judgment Practice in the 1990s: A New Day Has Begun—Hopefully*, 14 Am.J.Trial Advoc. 441, 455 (1991) (quoted source omitted). The same sign might just as recently have appeared in one of the many county courthouses in West Virginia.

What some circuit courts have characterized as our disapproval of summary judgment generally may have been communicated by certain of our decisions which have stated, for instance, that "[s]ummary judgment is not favored...." *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 708, 421 S.E.2d 247, 249 (1992); *see Sartin ex rel. Sartin v. Evans*, 186 W.Va. 717, 719, 414

S.E.2d 874, 876 (1991) ("We have consistently adopted a conservative stance toward summary judgment...."); *Chamberlaine & Flowers, Inc. v. McBee*, 177 W.Va. 755, 757, 356 S.E.2d 626, 628 (1987) ("Summary judgment, historically, has been viewed with caution in this jurisdiction.") In the future, however, circuit courts should not be influenced by whether or not summary disposition is favored. Rather, the appropriate inquiry is whether Rule 56, as interpreted by cases such as *Painter* and *Williams*, is satisfied. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole....") If the requirements of the Rule are met, summary disposition is appropriate.

**12.** Permissible inferences are drawn in the light most favorable to the non-moving party. *Williams*, 194 W.Va. at 59, 459 S.E.2d at 336. Such inferences, however, must at least be reasonably probable. *Id.* at 60, 459 S.E.2d at 337 n. 10.

U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted in original)).

 The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed "material" facts. *Williams,* 194 W.Va. at 60–61, 459 S.E.2d at 337–38. A material fact is one "that has the capacity to sway the outcome of the litigation under the applicable law." *Id.* at 60, 459 S.E.2d at 337 n. 13. As stated in *Anderson,* "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Finally, in reviewing a circuit court's grant of summary judgment, we undertake a *de novo* review and apply the same standard as utilized below. Syl.Pt. 1, *Painter,* 192 W.Va. at 190, 451 S.E.2d at 756.

The Appellant essentially asserts that summary judgment was inappropriate because the circuit court (1) impermissibly drew inferences against the Appellant; (2) weighed some testimony and disregarded other testimony; and (3) disregarded an unrebutted affidavit from plaintiff's expert witness. Each argument is addressed in detail below.

### 1. Improper Inferences and Weighing of Testimony

The first two alleged errors above can be consolidated. The Appellant essentially alleges that the improper inferences and the weighing and disregarding of evidence arose from two categories of facts. He asserts that, when properly considered under Rule 56, these two categories of facts precluded summary judgment. We disagree.

 The first category of facts deals with alleged inconsistencies in Mr. Law's statements about how the accident occurred. In sum, the conflicting statements only deal with specific events surrounding the accident like (1) whether Mr. Law saw the decedent falling to the ground or whether he first saw him after he hit the ground; (2) whether Mr. Law could see the decedent throughout the events that occurred, or whether he lost sight of the decedent and simply saw him on the ground when he got out of the truck; (3) whether the decedent was in front of the truck when the accident occurred or behind it; (4) whether one of the Laws or the decedent was holding Keno throughout the events that occurred; and (5) whether Mr. Law asked the decedent to hold Keno's rope or whether the decedent requested to handle the rope.

One can readily discern that these conflicting statements deal only with the chain of events that occurred immediately prior to the accident. Consequently, given the applicable law, these conflicts are insufficient to preclude summary judgment.[13] Even assuming all of the above versions of facts in favor of the Appellant, they have virtually no bearing on the elements of proof that will impact the outcome of this case. For instance, even if Mr. Law saw Keno kick the decedent or Mr. Law asked the decedent to hold Keno's rope, such does little if anything to aid in proving (1) whether Keno possessed any vicious or dangerous propensities of which the Appellees should have previously known; or (2) whether the Appellees could have reasonably and foreseeably anticipated Keno's conduct and the resulting injuries to the decedent. The first category of factual disputes, then, are not material because, even taken in the light most favorable to the Appellant, they simply do not have "the capacity to sway the outcome of the litigation under the applicable law." *Williams,* 194 W.Va. at 60, 459 S.E.2d at 337 n. 13. Accordingly, these disputes will

---

13. The Appellant appears to assert that one may reasonably infer that the Appellant's allegedly conflicting statements are an attempt to fabricate details of the incident and that this could impact the weight that the jury gives to his testimony generally. We do not dispute that, in an appropriate case, serious conflict in a movant's version of events may thwart an otherwise suitable motion for summary judgment. Nevertheless, having reviewed the record in detail, we conclude that the Appellant's proposed inference is terribly attenuated. For instance, if Mr. Law were truly intent on fabricating critical details, he certainly would not have admitted that Keno was a wild and rambunctious colt. Such a statement has a bit more impact on the applicable law than the largely irrelevant details of the accident. In sum, the Appellant's proposed inference rests more on " 'speculation and conjecture' " rather than reason. *Williams,* 194 W.Va. at 60, 459 S.E.2d at 337 n. 10 (quoting *Ford Motor Co. v. McDavid,* 259 F.2d 261, 266 (4th Cir.), *cert. denied,* 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958).

"not be counted" for purposes of summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

█ The second category of facts deals with the alleged knowledge and conflicting statements of some of the Appellees concerning Keno's vicious or dangerous propensities. As far as conflicting evidence on the issue, the Appellant first asserts that Robert Law stated that Keno was a "rambunctious, wild colt" and that he was "frisky" and did not like to be penned.[14] The Kovacs, however, apparently stated that Keno was never frisky or unruly.

Even if we assume Mr. Law's version of Keno's demeanor to be true, his statements still do not preclude summary judgment on the strict liability question. While we are aware of authority to the contrary, many courts agree that these general, unruly characteristics are insufficient to impose liability. *See, e.g., Williams v. Hawkins*, 304 So.2d 75, 77 (La.Ct.App.1974), *applic. denied*, 307 So.2d 373 (La.1975) ("Allegations of being 'high strung' or 'skittish' and testimony that the horse was acting up could not possibly be interpreted as a 'dangerous propensity,' especially when considered in light of the *common knowledge that a great many horses at times are skittish, high strung, and act up*.") (emphasis added); *see also Dubois v. Myers*, 684 P.2d 940 (Colo.Ct.App.1984); *Lawrence v. Windsor*, 693 S.W.2d 853 (Mo.Ct.App. 1985). Like the courts above, we conclude that traits like rambunctiousness and friskiness are insufficient to impose strict liability. In our view, given the strict liability standard, the proof cited by the Appellant to

avoid summary judgment is " 'merely colorable' " and not " 'significantly probative.' " *Williams*, 194 W.Va. at 60, 459 S.E.2d at 337 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted in original)). Accordingly, a reasonable jury could not return a strict liability verdict in favor of the Appellant.

█ We reach the same conclusion in regard to the Appellant's negligence cause of action. While we have been traditionally reluctant to affirm a grant of summary judgment in cases involving negligence, when one coalesces the proof here with the necessary elements of the cause of action, summary disposition was appropriate. As suggested in *Dawson*, and stated in *Trager*, " 'The amount of control required is that which would be exercised by a reasonable person based upon the total situation at the time, *including the past behavior of the animal and the injuries that could have been reasonably foreseen.*' " *Trager*, 445 Mich. at 106, 516 N.W.2d at 75–76 (emphasis added) (quoting *Arnold*, 94 Wash.2d at 871, 621 P.2d at 141) (en banc). Here, given Keno's past behavior and the facts existing at the time of the accident, there simply is nothing beyond a scintilla of evidence in the record to indicate that the Appellees failed to exercise ordinary care. In sum, no one could have reasonably foreseen the colt's actions under the facts alleged.[15]

## 2. Admissibility of the Expert Affidavit

█ The Appellant next asserts that the circuit court improperly disregarded the affidavit of Appellant's expert, Don Jox. Mr.

---

14. In Mr. Law's words, Keno, presumably like most six-month-old colts, "wanted to get out and run and play...."

15. The Appellant also pointed out several other facts of record which he asserts would tend to indicate both Keno's dangerous propensities and a failure to exercise due care. For instance, he notes, inter alia, that Keno (1) was only six months old; (2) had been injured a few days prior to the accident; and (3) had been separated from his mother for the first extended period of time on the date of the accident. While we have considered these facts and others, along with the permissible inferences to be drawn therefrom, they do not affect our disposition.

The Appellant also argues that the Home owed the decedent separate duties of care because the decedent was a business invitee of the Home and the decedent was injured on common ground between the Home as lessor of the property and the Laws as lessees. The Appellant's factual bases for these alleged separate duties, again, are quite attenuated. Nevertheless, even were we to assume that the facts warranted the imposition of such duties, we would conclude that the duties owed by the Home are practically coextensive with the negligence cause of action that we have outlined above. Accordingly, the business invitee and common ground theories are subject to the same analysis set forth herein, and summary judgment was thus properly granted.

716

Jox's affidavit consists of a single page. In the affidavit, he briefly lists some of the facts in the case and then conclusorily states as follows:

> 4. Based upon the foregoing, I give the following opinion:
>
> A) That Defendants ought to have known that Keno, a six month old quarter horse, was dangerously inclined and likely would inflict injury upon Delvious Jividen given the facts and circumstances surrounding the incident.
>
> B) That Defendants failed to exercise the reasonable care required to prevent Keno, the six month old quarter horse, from causing injuries to others.

While the affidavit appears to be inadmissible on several grounds, we are most concerned by its failure to explain *why*, given the facts, that the Appellees either (1) should have known of Keno's propensities, or (2) failed to exercise ordinary care. For instance, one is left to speculate why a six-month old quarterhorse with an injured knee and ear is more vicious or dangerous than any other horse. Given the perfunctory nature of the affidavit and the absence of any reasoned basis for Mr. Jox's opinion, we cannot conclude that the circuit court improperly disregarded it. *See M & M Medical Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.,* 981 F.2d 160, 165 (4th Cir.1992) (en banc), *cert. denied,* — U.S. —, 113 S.Ct. 2962, 125 L.Ed.2d 662 (1993) ("An expert's affidavit that is wholly conclusory and devoid of reasoning does not comply with Fed. R.Civ.P. 56(e)."); *see also Williams,* 194 W.Va. at 60, 459 S.E.2d at 337 n. 10 ("We need not credit purely conclusory allegations, indulge in speculation, or draw improbable inferences."); 28 Thomas J. Goger et al., Federal Procedure *Pleadings and Motions* § 62:598 (Lawyers ed. 1984); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738 at 486, 489 (2d ed. 1983) ("Thus, ultimate or conclusory facts and conclusions of law ... cannot be utilized on a summary judgment motion.") (footnotes omitted). Accordingly,

we conclude that this assignment of error is meritless.

### III. CONCLUSION

After careful consideration of the briefs, the record, and oral argument, we conclude that the circuit court properly granted summary judgment to the Appellees. Accordingly, based on the foregoing analysis, we hereby affirm the circuit court's order.[16]

Affirmed.

BROTHERTON and RECHT, JJ., did not participate.

MILLER, Retired J., and FOX, Judge, sitting by temporary assignment.

tional arguments, we conclude that they are not meritorious.

16. The Appellant also asserted that summary judgment was inappropriate on other grounds. While we have carefully considered those addi-