520 S.E.2d 884

**Debbie SIPPLE, as Administratrix of the Estate of Sidney Ward Sipple, Deceased, and Debbie Sipple, Individually, Plaintiff Below, Appellant,**

v.

**David STARR, Individually, and dba Rocket Mart, Inc., a West Virginia Corporation, and Petroleum Products, Inc., a Corporation, Defendants Below, Appellees.**

No. 25798.

Supreme Court of Appeals of West Virginia.

Submitted May 4, 1999.

Decided July 15, 1999.

Dissenting Opinion of Justice Davis July 20, 1999.

Stephen B. Farmer, Esquire, Philip J. Combs, Esquire, Farmer, Cline & Arnold, Charleston, West Virginia, W. Thomas Ward, Esquire, Ward & Associates, Williamson, West Virginia, Attorneys for Appellant.

Ancil G. Ramey, Esquire, Steptoe & Johnson, Charleston, West Virginia, Attorney for Appellees David Starr and Rocket Mart, Inc.

Charles M. Love, Esquire, Stuart A. McMillan, Esquire, Bowles Rice McDavid Graff & Love, Charleston, West Virginia, Attorneys for Appellee Petroleum Products, Inc.

McGRAW, Justice:

Appellant Debbie Sipple, administratrix for her son Sidney Sipple, appeals a grant of summary judgment for appellee, fuel distributor Petroleum Products Inc., in her wrongful death action, in which she sought damages for the death of her son, killed when visiting a convenience store in Mingo County known as the Rocket Mart. The Circuit Court of Mingo County granted summary judgment on the basis that appellee had no control over the operation of the store, was not liable for negligent selection of the store

1. PPI also provided diesel fuel, and may have provided other fuels as well for sale at the Rocket Mart.

2. W. Va.Code § 11–16–3(5) (1991) informs us: "Nonintoxicating beer" shall mean all cereal malt beverages or products of the brewing industry commonly referred to as beer, lager beer, ale and all other mixtures and preparations produced by the brewing industry, including malt coolers and containing at least

for distribution of its gasoline, and was not engaged in a joint venture with the store or its owner. Because we find that genuine issues of material fact do exist with regard to these allegations, we reverse.

## I.

### FACTUAL BACKGROUND

At the time of the events giving rise to this case, the Rocket Mart was a branded Chevron gas station and convenience store located near the Mingo County community of Red Jacket. Defendant below, David Starr, owned the Rocket Mart, and did business as Rocket Mart, Incorporated, an entity he owned in its entirety. Appellee and defendant below Petroleum Products, Inc. (hereinafter "PPI") sold Chevron gasoline [1] throughout southern West Virginia, through its own stores, or through other stores, such as the Rocket Mart.

PPI and Starr entered into an agreement whereby Starr would sell PPI gasoline to Rocket Mart customers. Starr owned the underground tanks; PPI provided, and retained ownership of, the gasoline pumps and associated equipment located upon the Rocket Mart property. PPI also retained ownership of all gasoline in the tanks until a customer purchased the gasoline. PPI paid Starr seven cents for each gallon sold.

Unlike most stores of its kind, the Rocket Mart was a full service establishment in that, in addition to the usual gasoline and groceries available at all such stores, it also contained what could be characterized as a bar area, where customers could purchase beverages containing alcohol (albeit legally defined as nonintoxicating) [2] for consumption on the premises, and could even enjoy a game of pool while doing so.

one half of one percent alcohol by volume, but not more than four and two-tenths percent of alcohol by weight, or six percent by volume, whichever is greater, all of which are hereby declared to be nonintoxicating and the word "liquor" as used in chapter sixty of this code shall not be construed to include or embrace nonintoxicating beer nor any of the beverages, products, mixtures or preparations included within this definition.

The cashier at the Rocket Mart wore two hats, acting as both cashier and attendant for the gas and grocery operation, and as bar keep for the sale of legal beverages consumed on the premises. Evidence in the record suggests that the tap for the draft beer was located next to the register, and that customers, should their credit history permit, could use a Chevron credit card to purchase a "cold one."

Luther Fields, II, worked at the Rocket Mart as a cashier. Starr kept a loaded gun near the cash register, and deposition testimony indicates that Fields had, on occasion, displayed the gun to customers of the store. Testimony also suggests that, on at least one occasion, Starr himself had taken this gun and exchanged fire outside the Rocket Mart with parties unknown.

Sidney Sipple[3] was present at the Rocket Mart on July 9, 1992, as he had been on many previous occasions. Sipple was an acquaintance of Fields, who was working that day as the cashier *qua* bartender of the Rocket Mart. During his visit to the store, Sipple engaged in horseplay with Fields. For reasons not entirely clear, Fields shot and killed Sipple with the aforementioned gun. Fields later plead guilty to manslaughter. On June 17, 1993, Debbie Sipple commenced the action giving rise to this appeal.

Initially, Ms. Sipple sued only Rocket Mart, Inc. In February of 1994, she filed an amended complaint alleging a separate cause of action against Starr, and sought to pierce the corporate veil. During the discovery process, Ms. Sipple learned of the relationship between PPI and Starr, and she filed in June of 1994 a second amended complaint to include claims against Starr, Rocket Mart,

Inc., and PPI. Ms. Sipple alleged, *inter alia*, that the defendants were liable for Fields' actions under theories of vicarious liability and *respondeat superior*. PPI moved for summary judgment, which the lower court granted, on the basis that PPI did not exercise sufficient control over the operation of the Rocket Mart to render it liable for the death of Sipple.[4]

In so doing, the lower court found that Ms. Sipple had presented no genuine issue of material fact as to whether PPI exercised control over Starr and the Rocket Mart, whether PPI negligently retained or selected Starr and the Rocket Mart to distribute its gasoline, and whether all defendants below were engaged in a joint venture. We believe that appellant did raise issues of fact on each of these allegations sufficient to render inappropriate the circuit court's grant of summary judgment. Accordingly, we reverse.

## II.

## STANDARD OF REVIEW

■ Summary judgment is granted appropriately in limited circumstances: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Casualty & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). We have elaborated upon this holding by explaining: ˉ

Roughly stated, a "genuine issue" for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does

3. Appellant Debbie Sipple is the mother of Sidney Sipple and serves as the administratrix of his estate.

4. There was much disagreement among the parties concerning the testimony of Starr. First deposed in 1993, Starr later provided appellant's counsel, in December of 1995, with an additional sworn statement that was not in complete harmony with the 1993 deposition. Starr's girlfriend and manager Robin Miller also provided a statement. The circuit court regarded these statements as depositions taken without proper notice to all parties, and ruled that they would be

ignored when the court considered PPI's motion for summary judgment.

The circuit court then granted PPI's motion by order dated March 25, 1996, but permitted appellant to depose Starr and Miller again, and allowed appellant the right to move for reconsideration based upon the new testimony. Appellant Sipple took the depositions and moved for reconsideration, but the court denied the motion.

Because we find that genuine issues of material fact exist on each of appellant's assignments of error, we need not address the nature of the sworn statements, nor the lower court's treatment of them, in this opinion.

not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed "material" facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law.

Syl. pt. 5, *Jividen v. Law*, 194 W.Va. 705, 461 S.E.2d 451 (1995).

## III.

## DISCUSSION

### A.

#### *Control*

PPI argues that Starr, doing business as Rocket Mart, was an "independent dealer" who, under the terms of their various agreements had "entire charge and control of the management of [PPI's] business for the purposes of accomplishment of [the sale of gasoline]." PPI properly identifies in its brief the importance of control [5] in any action involving an allegation of *respondeat superior* liability:

If the right to control or supervise the work in question is retained by the person for whom the work is being done, the person doing the work is an employee and not an independent contractor, and the determining factor in connection with this matter is not the use of such right of control or supervision but the existence thereof in the person for whom the work is being done.

Syl. pt. 2, *Spencer v. Travelers Insurance Company*, 148 W.Va. 111, 133 S.E.2d 735 (1963). *Accord, Farmers & Mechanics Mut.*

*Ins. Co. v. Casey*, 201 W.Va. 418, 497 S.E.2d 771 (1997)(per curiam).

The frequent, and often baseless, invocation of the independent contractor defense has eroded the confidence of courts in its applicability. Like the child who always places blame for an accident on a sibling or imaginary friend, the defendant employing the independent contractor defense must combat the reasonable cynicism of his audience:

The defense of "independent contractor" is one which defendants have long favored as a means of denying liability for acts which are done by those whom they neither control nor have a right to control. However, over the years, the defense has proved to be a slender reed and one which the courts have found difficult to apply.

*Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 625, 225 S.E.2d 218, 221 (1976) (footnote omitted). It is quite natural that a business entity would employ what it deems to be an "independent contractor" in an effort to limit its exposure to damages as much as possible; a business entity naturally will do everything legal to externalize its costs while increasing its profits. But society also has an interest in seeing that the costs of a particular activity are borne by those who profit from that activity.[6]

A danger inherent in the broad application of the independent contractor defense is that it often encourages large, solvent companies (which usually have superior technical expertise, better trained employees, more reliable equipment, and greater resources to compensate injured parties) to employ to carry out their work much smaller companies or individuals (which often have less knowledge, less experienced employees, less reliable equipment and little or no financial resources).[7] The result may be many uncom-

---

5. For an excellent discussion of the definition of "control" see, Phillip I. Blumberg, *The Corporate Entity in an Era of Multinational Corporations*, 15 Del. J. Corp. L. 283, 329–45 (1990).

6. See, generally, Guido Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts*, 70 Yale L.J. 499 (1961).

Hence "tort" costs should be borne by the activity which causes them even if other hidden costs cannot be allocated, and even if

other methods of allocating losses do a better job of loss spreading. We have not yet abandoned the basic economic structure which requires prices of goods to reflect all the costs which producing them or using them entail—far from it.
*Id.* at 533.

7. Scholars have recognized the social harm threatened by such an arrangement.

The externalization of risk to potentially judgement-proof contractors has an important

pensated injuries and enormous defaults on unemployment insurance premiums, workers' compensation premiums, taxes, pension obligations, and uncorrected environmental damage. *See, e.g., Connors v. Paybra Mining Co.*, 807 F.Supp. 1242 (S.D.W.Va.1992).

■ We have previously noted that:

"So riddled is the rule insulating a general contractor from an independent contractor's negligence that one court has aptly noted: 'Indeed it would be proper to say that the rule is now primarily important as a preamble to the catalog of its exceptions.' "(Citing in Footnote 3: *Pacific Fire Ins. Co. v. Kenny Boiler & Mfg. Co.*, 201 Minn. 500, 277 N.W. 226, 228 (1937).)

*Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 626, 225 S.E.2d 218, 221 (1976) (quoting *Summers v. Crown Construction Company*, 453 F.2d 998, 999 (4th Cir.1972)). What we recognized in *Sanders*, is that courts must be on guard against companies who attempt to abuse the defense. Thus we place on one arguing the defense, the burden of its proof.

One who would defend against tort liability by contending that the injuries were inflicted by an independent contractor has the burden of establishing that he neither controlled nor had the right to control the work, and if there is a conflict in the evidence and there is sufficient evidence to support a finding of the jury, the determination of whether an independent contractor relationship existed is a question for jury determination.

Syl. pt. 1, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976). In the instant case, appellant Sipple has introduced evidence that PPI retained substantial control over the operation of the Rocket Mart. Ms. Sipple introduced evidence that, under the written contracts between PPI and Starr, PPI made specific demands regarding the store's hours of operation, the cleanliness of its bathrooms, the appearance of the store and the signs used to sell PPI's gasoline. PPI also retained ownership of the gasoline until sold to customers, set the price of the gasoline, and required Starr to pay workers compensation and unemployment insurance premiums for all store employees. Additionally, PPI reserved a right of first refusal to purchase the Rocket Mart if Starr ever decided to sell it.[8]

---

implication. These contractors will tend to conduct their activities with less care then will actors with more at stake.... Therefore, the frequency of accidents will increase as a result of the externalization of risk.

A. Mitchell Polinsky and Steven Shavell, *Punitive Damages: An Economic Analysis*, 111 Harvard L.Rev. 869, 944 (1998) (footnote omitted).

8. The "Complete Management Fee Agreement" signed by Starr and by Patrick Graney, titled as president of PPI, contained the following language:

2. Seller [PPI] shall deliver to Manager [Starr] stocks of gasoline .... Seller will fix the prices at which the products are to be dispensed by manager....

6. All sales shall be for cash, provided however, credit sales made be made by Manager for Seller's account only after prior written authority has been obtained from ... Seller.

11. Authorized representatives of Seller may take inventory, and inspect Seller's property, stocks, goods and merchandise of whatever kind at any time.

12. ... [Manager] shall pay all premiums and contributions required by Workman's [sic] Compensation, Unemployment Insurance ....

14. Manager shall: (a) operate Seller's [PPI's] motor fuel operation during the hours specified in the "Motor Fuel Dispensing Hours of Operation" appended hereto as Attachment "B"; ... (b) operate the motor fuel operations responsibly with due care, prudence, good judgment and skill; (c) treat all customers courteously including responding expeditiously to all complaints of such customers and making fair adjustments where appropriate; ... (g) maintain the restrooms in a clean, sanitary, and well lighted condition and adequately provided with necessary supplies; (h) provide sufficient trained and courteous personnel to serve the needs and desires of the motoring public; (i) keep the driveways, yards, lawns, shrubs, and other plantings neat and free from weeds, debris, snow, ice, and rubbish....

16. ... Manager further agrees that he will carry employer's liability and workmen's [sic] compensation insurance for himself and his employees. In addition, manager agrees to maintain premises liability insurance against property damage of, or personal injury to others in the amount of at least $500,000 and have Petroleum Products, Inc. listed as an additional insured.

28. ... Petroleum Products Inc. and/or Mr. Patrick C. Graney, III of Charleston, West Virginia shall have the first option of purchase of said business or property and shall have the first right of refusal to match any bona-fide offers for purchase ....

We also take note of the fact that PPI required Starr to purchase liability insurance, forbade illegal activities on the premises, demanded compliance with local laws, required "courteous personnel," and required Starr to respond expeditiously to customer complaints.[9]

Furthermore, Ms. Sipple presented testimony showing that PPI retained significant control over the store's daily operations, beyond the express terms of the agreements. For example, a representative of PPI ordered Starr, at various times, to clean the exterior of the store "right away," to remove ceramic animals from the front of the store, to not argue with his girlfriend in the store, to obtain a liquor license to increase sales of gasoline, to ring up food items as "gas" on Chevron credit cards, and to fire an employee of the Rocket Mart because she had "bad teeth."[10]

PPI argues that it had no more control over the operation of the Rocket Mart than any other supplier of any product sold at the store, and that, if PPI is found liable, all suppliers face endless, open-ended liability for merely supplying products to a store where a tort is committed. We disagree; we simply do not see a representative of Frito-Lay or Coca-Cola discussing the advantages of orthodontia for a particular Rocket Mart employee, or successfully demanding the removal of Starr's ceramic menagerie.

Though our recitation of the facts might suggest otherwise, we are not taking the position that the plaintiff should prevail at trial. We note that Ms. Sipple has raised a genuine issue over the material fact of PPI's control of the Rocket Mart, and PPI has not met its burden of proving the existence of the independent contractor relationship. Thus, summary judgment as to this issue is improper.

We by no means wish to suggest that the defense of independent contractor is not a valid defense under our law. Nor are we saying that mere indicia of control will vitiate any independent contractor relationship, but only that, where substantial evidence of control has been offered, the question should be submitted to a jury. Where a question as to the existence of an independent contractor relationship exists and a party has presented substantial evidence indicating a principal's control over the work performed, the determination of the existence of such a relationship is for the jury, and a grant of summary judgment is inappropriate.

**B.**

*Negligent Selection*

■ Another argument made by Sipple is that PPI was negligent in hiring Starr and/or Rocket Mart to sell PPI gasoline. We have held that such a tort exists in West Virginia. "There can be no doubt that this court has recognized a cause of action based upon a claim of negligent hiring...." *McCormick v. West Virginia Dept. of Public Safety*, 202 W.Va. 189, 193, 503 S.E.2d 502, 506 (1998). *Accord State ex rel. West Virginia State Police v. Taylor*, 201 W.Va. 554, 560 n. 7, 499 S.E.2d 283, 289 n. 7 (1997). We identified this cause of action for the first time in *Thomson v. McGinnis*, 195 W.Va. 465, 465 S.E.2d 922 (1995).

We found in *Thomson* that a principal (in that case a real estate broker) may be held liable to a third party for civil damages if the principal is negligent in the selection and retention of a contractor, and if such negligence proximately causes harm to the third party. *See Thomson v. McGinnis*, 195 W.Va. 465, 465 S.E.2d 922 (1995); *King v. Lens Creek Ltd. Partnership*, 199 W.Va. 136, 483 S.E.2d 265 (1996).

In *Thomson*, we noted that we are not alone in allowing a plaintiff to recover from a principal who has negligently hired a contractor:

> Other jurisdictions have entertained a cause of action for negligent hiring of an independent contractor, reasoning that

---

9. It appears from the record that Starr failed to obtain the insurance required by the agreements. *See* note 8, *supra*.

10. In reference to a question regarding PPI's control over Starr's hiring and firing practices, Starr replied: "But PPI is not going to let me throw no rotten-tooth girl behind the counter neither, you know."

negligently securing the services of the independent contractor falls within one of several typically recognized exceptions to the rule that an employer is not liable for the actions of his independent contractor. See *Payne v. Lee*, 686 F.Supp. 677, 679 (E.D.Tenn.1988), *aff'd sub nom. Payne v. The Law Center*, 872 F.2d 1027, 1989 WL 40258 (6th Cir.1989); *Sullivan v. St. Louis Station Associates*, 770 S.W.2d 352, 354–55 (Mo.App.1989).

For instance, in *Del Signore v. Pyramid Sec. Servs., Inc.*, 147 A.D.2d 759, 537 N.Y.S.2d 640 (1989), the New York court held that an action for negligent hiring of an independent contractor who assaulted concert patrons could be maintained "where the employer engages an unqualified or careless contractor or, when on notice of deficient performance, fails to prevent the continuance of such negligence."

*Thomson v. McGinnis*, 195 W.Va. 465, 471, 465 S.E.2d 922, 928 (1995) (footnotes and some citations omitted). Appellant Sipple introduced evidence that PPI knew that Starr kept a gun upon the premises, that Starr had engaged in a firefight outside of the store, and that Fields had toyed with the gun in the presence of customers before. Whether or not a jury would agree with her, we feel that Sipple has presented a genuine issue of a material fact, namely that PPI was on notice of the deficient performance of Starr and the Rocket Mart, and failed to prevent the continuance of such negligence.

In *Thomson*, we found that the real estate broker, who volunteered to find a contractor for a furnace inspection, could be found liable for her negligent hiring of a contractor who, as it turned out, was not qualified to inspect furnaces. In the case before us, a man was killed with a gun that PPI allegedly knew was on the premises, by an employee PPI purportedly knew had brandished the gun in the past. If we found sufficient cause in *Thomson* to overturn a grant of summary judgment, we find ample reason in the instant case to do the same.

■ The *Thomson* court confined its holding to the context of the case before it, but acknowledged the influence of section 411 of the Restatement (Second) of Torts upon its decision. See *Thomson*, 195 W.Va. at 471 n. 6, 465 S.E.2d at 928 n. 6; *King v. Lens Creek Ltd. Partnership*, 199 W.Va. 136, 140, 483 S.E.2d 265, 269 (1996). That section states:

An employer is subject to liability for physical harm to third persons caused by his [or her] failure to exercise reasonable care to employ a competent and careful contractor

(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or

(b) to perform any duty which the employer owes to third persons.

Restatement (Second) of Torts § 411 (1965).[11] We concur with the sentiment that a principal is liable for harm caused by his or her failure to exercise reasonable care to employ a competent and careful contractor, and we adopt this section of the Restatement.

It remains to be seen whether a jury would find PPI negligent under this standard. However, because appellant Sipple has introduced evidence that suggests PPI did not exercise reasonable care in its selection of Starr and the Rocket Mart as retailers of its gasoline, the lower court's grant of summary judgment was inappropriate.

### C.

#### Joint Venture

■ Ms. Sipple argues that the lower court should not have granted summary judgment as to her claim that PPI, Starr,

---

11. One illustration provided by the Restatement may ring familiar to many citizens of West Virginia's coal fields:

A, a builder, employs B, a teamster, to haul material through the streets from a nearby railway station to the place where A is building a house. A knows that B's trucks are old and in bad condition and that B habitually employs inexperienced and inattentive drivers. C is run over by a truck carrying A's material and driven by one of B's employees. A is subject to liability to C if the accident is due either to the bad condition of the truck or the inexperience or inattention of the driver.

Restatement (Second) of Torts § 411 cmt. d, illus. 5 (1965).

and the Rocket Mart were engaged in a joint venture. We have previously defined the term:

A joint venture or, as it is sometimes referred to, a joint adventure, is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. It arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied.

Syl. pt. 2, *Price v. Halstead,* 177 W.Va. 592, 355 S.E.2d 380 (1987); *accord, Johnson v. State Farm Mut. Auto. Ins. Co.,* 190 W.Va. 526, 438 S.E.2d 869 (1993).

The evidence suggests that PPI provided property, in the form of signs, gas pumps, and associated equipment, as well as its skill and knowledge in the sale of gasoline, to the operation of the Rocket Mart. Starr, of course, provided the location, the store, and the personnel necessary to makes sales of gasoline to the public. Although Starr did not pay directly to PPI some fractional share of every sale of beer or groceries, PPI still could be said to have profited from those sales. It is possible that a jury could find that, the more customers attracted to the Rocket Mart to buy non-gas products, the more potential customers for PPI gasoline, and the converse as well. We feel a jury should be able to consider whether the arrangement produced mutual benefit for both Starr and PPI.[12]

■ PPI contends that, because there was no direct sharing of profits, there could be no joint venture. The convenience store/gas combination so prevalent today presents a relationship difficult to categorize, but its symbiotic nature suggests that the joint venture label may be appropriate in certain circumstances. We have noted that, intrinsic to a joint venture, is the concept of mutual efforts to promote the business, the success of which would accrue to the benefit of all parties:

To constitute a joint adventure the parties must combine their property, money, efforts, skill, or knowledge, in some common undertaking of a special or particular nature, but the contributions of the respective parties need not be equal or of the same character. There must, however, be some contribution by each party of something promotive of the enterprise.

*Pownall v. Cearfoss,* 129 W.Va. 487, 497–498, 40 S.E.2d 886, 893 (1946) (citation omitted).[13]

Sipple presented substantial evidence that both PPI and Starr contributed "property, money, efforts, skill [and] knowledge" to the operation of the Rocket Mart, and that both parties made contributions "promotive of the enterprise." *Pownall, supra.* We are by no means suggesting that just any mutually beneficial commercial relationship, such as the combination of a gas station and convenience store, rises to the level of a joint venture. We do feel, however, that Sipple raised a jury question as to this issue in the instant case, and that summary judgment was improvidently granted as to this contention.

## IV.

## CONCLUSION

For the reasons set forth above, we reverse, and remand this case for proceedings consistent with this opinion.

---

**12.** We have also looked for the existence of a "common purpose" when attempting to apportion liability among parties:

Where the lessor and lessee of land, acting in pursuance of a common purpose, the lessor permitting the lessee to erect structures which cause damage to the land of another, there is no misjoinder of parties or actions in making such lessor and lessee parties defendant in a single action brought by the injured party for such damages.

Syl. pt. 2, *O'Dell v. McKenzie,* 150 W.Va. 346, 145 S.E.2d 388 (1965)(citing *Flanagan v. Gregory & Poole,* 136 W.Va. 554, 67 S.E.2d 865). *Accord, West Virginia Div. of Environmental Protection v.*

*Kingwood Coal Co.,* 200 W.Va. 734, 755, 490 S.E.2d 823, 844 (Starcher J., Dissenting)(1997); *Reynolds v. Pardee & Curtin Lumber Co.,* 172 W.Va. 804, 310 S.E.2d 870 (1983); *Cowan v. One Hour Valet, Inc.,* 151 W.Va. 941, 157 S.E.2d 843 (1967).

**13.** A defendant seeking to avoid the application of joint venture liability makes many of the same arguments as one adopting the independent contractor defense. Those seeking to impose liability in either case have the same goal, to encourage the internalization of risks. *See, e.g.,* Robert B. Thompson, *Unpacking Limited Liability,* 47 Vand. L.Rev. 1, (1994).

Reversed and remanded.

Justice MAYNARD, deeming himself disqualified, did not participate in the decision of this case.

Judge KAUFMAN, sitting by special assignment.

DAVIS, Justice, dissenting:

(Filed July 20, 1999)

This was a simple and routine summary judgment case that has turned into a litigation nightmare. In this case, Sipple sought to hold Petroleum Products, Inc. (hereinafter "PPI"), a supplier of gasoline, liable for the death of her son, solely upon the basis that PPI distributed gasoline through the store in which her son was killed. Under the majority decision today, distribution of gasoline is all that is needed to establish a joint venture. Such a finding is contrary to the law. A joint venture requires a combination of property and skill to create a business entity, with a joint proprietary interest in which both parties share in the profits and maintain a mutual right to control the created enterprise. The sharing of profits must be joint and not several. *See* 10B Michie's Jurisprudence *Joint Ventures*, § 2 (1995).

In this case, PPI did not own the store and did not control the store. PPI's interest in the store involved only the distribution of its gasoline. Thus, the circuit court correctly concluded that no material issue of fact was in dispute, as PPI was not engaged in a joint venture with the store owner. It was specifically determined by the circuit court that (1) David Starr, the only shareholder of Rocket Mart, owned and controlled Rocket Mart's premises; (2) PPI had no control over the store's daily affairs, including the hiring and firing of Rocket Mart employees; and (3) PPI and David Starr did not share in profits. The circuit court's decision was consistent with the standard for granting summary judgment. That is, "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 1, *Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W.Va. 135, 506 S.E.2d

578 (1998). "The question to be decided on a motion for summary judgment is whether there is a genuine issue of fact and not how that issue should be determined." Syl. pt. 5, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). In Syllabus point 2 of *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995), we explained that

Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Finally, in Syllabus point 5 of *Jividen v. Law*, 194 W.Va. 705, 461 S.E.2d 451 (1995), we explained the meaning of "genuine issue" as follows:

Roughly stated, a "genuine issue" for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed "material" facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law.

The facts of this case are consistent with the decision in *Cardounel v. Shell Oil Co.*, 397 So.2d 328 (Fla.Dist.Ct.App.1981). In *Cardounel*, the plaintiff drove into a service station to obtain water for his overheating vehicle. The service station was owned by Shell and leased to the gas station operator. The plaintiff got into an argument with the gas station operator, which culminated in the plaintiff being shot. An action was brought by the plaintiff in which he sought to hold Shell liable for the station operator's conduct. The trial court granted summary judgment to Shell. The appellate court affirmed, and in doing so held that "[t]he trial court was correct on the theory that [the gas station operator] was not an agent or employee, but was an independent contractor." *Cardounel*,

397 So.2d at 328–329. (Citations omitted). *See also Hoffnagle v. McDonald's Corp.*, 522 N.W.2d 808 (Iowa 1994) (affirming summary judgment for McDonald's because it did not have day-to-day operations control over franchisee); *Smith v. Exxon Corp.*, 436 Pa.Super. 221, 647 A.2d 577 (1994) (affirming dismissal of case against Exxon because it had only quality control over gasoline); *Myszkowski v. Penn Stroud Hotel, Inc.*, 430 Pa.Super. 315, 634 A.2d 622 (1993) (affirming summary judgment for Best Western because it did not control operative details of franchisee).

The majority opinion has leaped beyond rationality and reasonableness in order to conclude that genuine issues of material fact exist as to whether PPI was engaged in a joint venture with David Starr. With such an analysis, I cannot agree. Therefore, I respectfully dissent. I am authorized to state that Judge Kaufman, sitting as special judge, joins me in this dissent.