625 S.E.2d 373

**Rita K. HERROD and Jennifer A. Herrod, Plaintiffs Below, Appellants,**

v.

**FIRST REPUBLIC MORTGAGE CORPORATION, INC., dba First Security Mortgage Corporation, A Corporation; Washtenaw Mortgage Company, A Corporation; Chase Manhattan Mortgage Corporation, A Corporation; Earl Young; Craddocks Last Stand, Inc., A Corporation; Darleen Westfall; West Virginia Real Estate Appraiser Licensing and Certification Board; and Federal National Mortgage Association, Defendants Below, Appellees.**

No. 32611.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 14, 2005.

Decided Dec. 1, 2005.

Concurring and Dissenting Opinion Justice Davis Dec. 7, 2005.

Concurring Opinion of Justice Starcher Dec. 16, 2005.

Bren J. Pomponio, Daniel F. Hedges, Mountain State Justice, Inc., Charleston, for the Appellants.

R. Terrance Rodgers, Nicholas P. Mooney, Pamela C. Deem, Allen, Guthrie, McHugh & Thomas, Charleston, for the Appellee, Washtenaw Mortgage Company.

ALBRIGHT, Chief Justice:

Appellants Rita Herrod and Jennifer Herrod (collectively referred to as the "Herrods") seek relief from an adverse summary judgment ruling issued by the Circuit Court of Kanawha County in connection with an illegal and predatory lending practices action they filed against Appellee Washtenaw Mortgage Co. ("Washtenaw").[1] Upon our full review of the record before us and consideration of the arguments of counsel, we determine that summary judgment was improperly granted with regard to some of the claims asserted by Appellants due to the existence of certain issues of fact that remain to be determined. Accordingly, the decision of the lower court is affirmed, in part, reversed, in part, and this matter is remanded for further proceedings consistent with the holdings of this opinion.

## I. Factual and Procedural Background

The Herrods, who are mother and daughter, reside in a home located in Clarksburg, West Virginia, that Mrs. Herrod purchased in July 1994 for the amount of $22,000.[2] In April of 1999, the Herrods refinanced the home with a construction loan from a local bank. The loan amount of $51,484.67[3] was initially applied to pay off the first mortgage and the remainder was used for improvements to the home.

In March 2000, while working at Heilig–Myers as a Credit Manager, Jennifer Herrod was approached by Earl Young, a loan broker for First Security Mortgage Corporation ("First Security")[4] while he was handing out business cards for First Security. When Ms. Herrod decided to respond to Mr. Young's solicitation, he represented that he would search for a home loan on her behalf that carried a lower interest rate than her existing loan.[5]

On April 5, 2000, Bob Cress, who was Mr. Young's boss and the vice-president of First Security, came to the Herrod residence to collect information germane to the loan application. Based upon Mr. Cress's inspection of the home on that date, he informed the Her-

1. Washtenaw is the only remaining defendant of the various individuals and businesses that were sued by the Herrods after settlement and dismissals as a result of previous summary judgment rulings.

2. Although Mrs. Herrod originally purchased the home for her daughter, she moved into the home to live with Jennifer Herrod and her four grandchildren in September 1998.

3. The initial annual percentage rate for the fifteen-year adjustable rate loan was 7.820%.

4. Ms. Herrod was familiar with Mr. Young, as he was a process server for Heilig-Myers.

5. Ms. Herrod decided to contact Mr. Young when she learned that the interest rate on her mortgage was about to increase to 9.125%. *See supra* note 3.

rods that their home was worth between $118,000 and $138,000. The figure of $138,000 was placed on the loan application with regard to the estimated value of the home. During this litigation, the Herrods testified that their personal estimate of the subject home's worth at the time was $70,000.[6]

During that April 5, 2000, meeting at their home, the Herrods completed a handwritten loan application.[7] Although Rita Herrod volunteered to Mr. Young that she would not be employed a month from the estimated loan closing date, she testified that Mr. Young assured her that their future income was of no consequence to the issuance of the loan.[8] Appellants maintain that when Messrs. Young and Cress left their home, they did not leave any documents with the Herrods. The record in this case, however, contains various lending documents that bear their signatures.[9] The Herrods do not disclaim the authenticity of the signatures on those forms, just that "they were totally unaware of what the documents were" since they allege they were not given copies of the signed documents when the brokers departed.

Following the home visit, the loan brokers prepared an appraisal request form on which

Mr. Young provided two figures suggesting alternative values of $118,000 and $137,000 for the Herrod home. The form was transmitted by facsimile to Mr. Jack Weaver who worked for a real estate appraisal company known as Craddock's Last Stand in Parkersburg, West Virginia. Purportedly, there was an arrangement between Mr. Weaver and First Security whereby Mr. Weaver would provide inflated appraisals in connection with loans being pursued by First Security.[10] When the appraisal report came back, the Herrod home was valued at $118,000.[11]

On April 24, 2000, the Herrods went to First Security's office in Clarksburg, West Virginia, to close the loan. At the closing, Mr. Young told the Herrods that the lower appraisal amount ($118,000, rather than the hoped for $137,000) required them to reduce their broker fees to "have enough room to do the loan." In actuality, the loan documents indicate that more than $10,000 in fees [12] were paid in connection with the loan issued by Washtenaw to the Herrods. These fees included a $3,052 payment from Washtenaw to First Security for obtaining the Herrods' signature on a higher interest rate loan. This payment, which Appellants characterize as a "kickback," was in the form of a yield

---

6. This valuation was purportedly based on a prior appraisal performed in connection with refinancing they procured in 1999 to perform certain home improvements.

7. At the loan closing, this application was typed.

8. During her deposition, Mrs. Herrod was questioned regarding disclosures she made about her employment situation:
   Q. At the time you filled out the application, where were you working?
   A. Actually, I was on a severance package from Byard Mercer Pharmacy.
   Q. So your employment had already terminated?
   A. Correct, and I told Mr. Young that, and he said that it didn't matter. All that mattered was today, and as long as I was still getting a paycheck, that that's all that mattered.

9. Those documents include a Retention Agreement; a Disclosure Statement; a Mortgage Loan Origination Agreement; a Good Faith Estimate; and a Truth–in–Lending Disclosure Statement. The first three documents were signed on April 5, 2000, and the last two were mailed to the Herrods on April 6, 2000, and signed in advance of the closing that took place on April 24, 2000.

10. The arrangement purportedly involved the use of two figures on the appraisal request form; one being a "deal breaker" and the other a so-called "Christmas figure." Mr. Weaver would instruct one of his appraisers to inspect the property and then someone in the home office would complete the report by providing the comparables necessary to obtain the value sought by the loan broker.

11. Later when the Herrods tried to place their home on the market, they were told by a local realtor that the home could not sell for more than $70,000 to $75,000.

12. The fee breakdown is as follows:

| | |
|---|---|
| Loan origination fee (First Security) | $ 4,000 |
| Underwriting fee (Washtenaw) | $ 250 |
| Broker fee (First Security) | $ 2,600 |
| Processing fee (First Security) | $ 290 |
| Service set up fee (Washtenaw) | $ 100 |
| Administrative fee (First Security) | $ 75 |
| Yield spread premium (Washtenaw) | $ 3,052 |
| Settlement/closing fee (Midwest Title) | $ 125 |
| **Total** | $ 10,492 |

spread premium, which is ostensibly paid to the broker by the lender for the purpose of enabling the borrower to avoid higher up front fees at the closing. *See generally Culpepper v. Inland Mortgage Corp.*, 132 F.3d 692 (11th Cir.1998) (discussing operation of yield spread premiums). The cost to the borrower for this arrangement is payment of a higher interest rate on the loan they obtain instead of the lower rate for which they qualified.

The promissory note the Herrods executed at closing provided for monthly payments of $759.56 [13] for a thirty-year loan term and carried a 9% annualized interest rate. With the loan proceeds, the Herrods refinanced their previous mortgage; paid off credit card debt; [14] and received $9,936.25 in cash. As part of the closing costs, the Herrods paid $419.83 to Washtenaw and $6,965 to First Security. On or after the closing, Washtenaw paid $3,304 to First Security. [15]

Seven weeks after the closing, Federal National Mortgage Association ("Fannie Mae") purchased the Herrods' loan with Washtenaw. After a civil action was initiated by the Herrods on September 27, 2001, and Fannie Mae became aware of the fact that the fees Washtenaw charged the Herrods exceeded the 5% cap they place on the loans they purchase, [16] it sold the loan to Chase Manhattan Mortgage. [17] During the pendency of this civil action, Rita Herrod testified [18] before the United States Senate Committee on Banking, Housing, and Urban Affairs concerning her loan experience with respect to the issue of the abusive use of yield spread premiums and predatory lending practices.

Through the complaint they filed against First Security, Washtenaw, Chase Manhattan Mortgage, [19] Earl Young Craddock's Last Stand, Darleen Westfall, [20] and West Virginia Real Estate Appraiser Licensing and Certification Board, the Herrods asserted various claims allegedly grounded in illegal and predatory lending practices. Following discovery, Washtenaw filed a motion for summary judgment upon which the trial court heard argument on December 4, 2003. At the end of the hearing, the circuit court granted summary judgment to Washtenaw on various claims asserted against them in the second amended complaint. [21] The Herrods did not appeal the granting of summary judgment as to those claims, which were memorialized in a January 21, 2004, order. At end of the summary judgment hearing, the trial court directed counsel for the Herrods and Wash-

13. The Herrods testified that the loan from Washtenaw reduced the interest rate on their mortgage payment and also reduced their monthly payments by $500 or $600.

14. The complaint provides figures indicating that proceeds from the Washtenaw loan were used to pay off $23,211 in credit card debt and $1600 was repaid to a 401(K) plan.

15. This amount was not part of the loan proceeds.

16. This 5% fee cap policy was announced by Fannie Mae on April 11, 2000.

17. *See infra* note 19. While we do not rely on the entry of a stipulated order of dismissal on October 27, 2004, after the entry of the summary judgment ruling under consideration wherein Appellants dismissed any claims they had against Chase Manhattan Mortgage, we note for clarification purposes only that Washtenaw repurchased the loan at issue from Chase Manhattan Mortgage, who was the servicer of the loan, after Fannie Mae learned that the loan terms were in violation of its corporate policy with regard to fee charging.

18. On January 8, 2002, Rita Herrod testified to the Senate Committee that if Mr. Young had not taken a kickback through the use of the yield spread premium, she would have obtained a loan interest rate of 8.5% or lower. She further opined: "I do not think it was worth $10,000 [in fees] to get a loan that is worse than what I had."

19. Chase Manhattan Mortgage was the servicer for the loan when it was owned by Fannie Mae. After suit was filed, Chase purchased the loan from Fannie Mae for repurchase by Washtenaw.

20. Ms. Westfall was an appraiser employed by Craddock's Last Stand.

21. Those claims include allegations concerning the non-registration by First Security as a credit services organization; breach by Washtenaw of a fiduciary duty to the Herrods; engagement by Washtenaw in the unauthorized practice of law; engagement by Washtenaw in fraud and conspiracy with regard to the appraisal of the Herrods' home; various claims grounded in dishonesty, misrepresentation, and breach of professional standards; acceptance of fee contingent upon predetermined conclusion; and failure to supervise appraisers.

tenaw to submit proposed findings of fact and conclusions of law on the remaining claims. On June 23, 2004, the trial court granted summary judgment to Washtenaw on the remaining claims asserted by the Herrods. It is from that second summary judgment ruling that the Herrods seek relief.

## II. Standard of Review

As this Court stated in syllabus point one of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), "[a] circuit court's entry of summary judgment is reviewed *de novo.*" In syllabus point three of *Aetna Casualty & Surety Co. v. Federal Insurance Company*, 148 W.Va. 160, 133 S.E.2d 770 (1963), this Court explained: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." We further elucidated in syllabus point two of *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995): "Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Just as is required by the lower court, this Court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion." *Painter*, 192 W.Va. at 192, 451 S.E.2d at 758. With these standards in mind, we proceed to determine whether the grant of summary judgement to Washtenaw was precipitous under the facts of this case.

## III. Discussion

### A. Unconscionability

In granting summary judgment to Washtenaw on the remaining claims through the June 23, 2004, order, the trial court ruled that Washtenaw was entitled to judgment on the Herrods' claim that the loan was illegal on grounds of unconscionability. In making this ruling, the trial court cited *Hager v. American General Finance, Inc.*, 37 F.Supp.2d 778 (S.D.W.Va.1999) for the proposition that "[u]nconscionability claims as-

serted under W.Va.Code § 46A–2–121 can be disposed of on summary judgment." *Hager* does recognize that the statutory claim of unconscionability in West Virginia "is a question of law to be determined based on the factual circumstances of the case" and consequently can be determined at the summary judgment stage. 37 F.Supp.2d at 787. But *Hager* equally stands for the proposition that where there are questions of fact regarding "whether the parties' bargaining power was grossly unequal so as to render the transactions between the plaintiffs and defendants unconscionable," summary judgment is improper. *Id.*

In *Hager*, the district court looked to the unsophisticated and uneducated nature of the plaintiffs to determine that, upon examination of the evidence presented in the light most favorable to the plaintiffs, genuine issues of fact precluded resolution of the unconscionability claim through summary judgment. Explaining the considerations relevant to such a claim, the district court opined:

> A determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, and the existence of meaningful alternatives available to the plaintiffs. A bargain may be unconscionable if there is "gross inadequacy in bargaining power, together with terms unreasonably favorable to the stronger party...." Gross inadequacy in bargaining power may exist where consumers are totally ignorant of the implications of what they are signing, ... or where the parties involved in the transaction include a national corporate lender on one side and unsophisticated, uneducated consumers on the other, ....

*Hager*, 37 F.Supp.2d at 786–87 (citations omitted). The *Hager* plaintiffs' lack of sophistication, lack of education, and the allegation that they did not understand what they were signing all combined to convince the appellate court that questions of fact remained as to whether the credit transactions at issue were unconscionable. 37 F.Supp.2d at 787.

The facts of this case, as presented by Appellants, arguably involve at least one unsophisticated and relatively uneducated plaintiff, given that Mrs. Herrod dropped out of school after the tenth grade.[22] Appellants aver that although Jennifer Herrod worked in the collections department of Heilig–Myers, she was not familiar with mortgage transactions and she was unaware of the details of the loan terms. The Herrods maintain the closing was a rushed ordeal with little or no explanation offered as to the various documents handed to them for signing. Purportedly, the closing agent was late to the lunch hour closing;[23] was new to the position; and knew very little about the papers she handed to the Herrods to sign.

In *Arnold v. United Companies Lending Corp.*, 204 W.Va. 229, 511 S.E.2d 854 (1998), this Court emphasized how critical the facts of each case are in determining whether a particular transaction or agreement is unconscionable. After acknowledging that the West Virginia Consumer Credit and Protection Act[24] fails to define the term "unconscionable," we referenced our previous reliance on the definition provided in the Uniform Consumer Credit Code based on the identical language of the provisions. *Id.* at 235, 511 S.E.2d at 860.

> The drafters of the Uniform Consumer Credit Code explained that the principle of unconscionability "is one of the prevention of oppression and unfair surprise and not the disturbance of reasonable allocation of risks or reasonable advantage because of superior bargaining power or position." *See* Uniform Consumer Credit Code, § 5.108 comment 3, 7A U.L.A. 170 (1974). The drafters stated:
>
> > The basic test is whether, in the light of the background and setting of the market, the needs of the particular trade or case, and the condition of the particular parties to the conduct or contract, the conduct involved is, or the contract or

clauses involved are so one sided as to be unconscionable under the circumstances existing at the time the conduct occurs or is threatened or at the time of the making of the contract.

*Id.* The drafters explained further that *"[t]he particular facts involved in each case are of utmost importance* since certain conduct, contracts or contractual provisions may be unconscionable in some situations but not in others." *Id.*

204 W.Va. at 235, 511 S.E.2d at 860 (emphasis supplied).

■ Accordingly, we hold that where unconscionability is asserted under West Virginia Code § 46A–2–121, the existence of questions of fact regarding whether the bargaining power was grossly unequal and thereby rendered the transactions between the plaintiffs and defendants unconscionable precludes the resolution of such claims through summary judgment. Only when there are no factual disputes in existence can an unconscionability claim under West Virginia Code § 46A–2–121 be determined as a question of law based on the undisputed factual circumstances and resolved through summary judgment. *See Mallory v. Mortgage America, Inc.*, 67 F.Supp.2d 601, 612 (S.D.W.Va.1999) (stating that "[u]nconscionability claims should but rarely be determined based on the pleadings alone with no opportunity for the parties to present relevant evidence of the circumstances surrounding the consummation of the contractual relationship").

■ In ruling against the Herrods on their claim of unconscionability, the trial court found, *inter alia*, that "[t]he Herrods have produced no evidence that the fees paid to First Security were 'excessive' " and also that "[t]he Herrods have produced no evidence that Ms. Westfall's appraisal of the Herrods' residence was somehow fraudulent or that she somehow misrepresented the true mar-

---

**22.** Our review of the record, however, indicates that Mrs. Herrod did obtain her G.E.D.

**23.** The closing was held on Jennifer Herrod's lunch hour. Appellants suggest that the hurried nature of the closing is demonstrated by the fact that some of the documents signed indicate that

the closing occurred in Parkersburg, when in fact the closing took place in the Clarksburg office of First Security.

**24.** *See* W.Va.Code §§ 46A–2–101 to 2–139 (Repl. Vol. 1999).

ket value of the Herrods' residence." Our review of the record indicates that the Herrods have introduced sufficient evidence on each of these issues to present questions of fact. The record contains the loan agreements which, on their face, demonstrate fees that amount to more than 10.5 % of the loan amount.[25] As evidence of the alleged excessive nature of the fees charged in connection with their loan, Appellants refer to the fact that up-front fees in excess of 8% of the total loan amount are indicia of a "high cost" loan under federal law.[26] Further evidence upon which Appellants rely to prove the excessiveness of the fees is the buy-back of the loan that occurred when Fannie Mae discovered that the fees charged by Washtenaw were in violation of its corporate policy.[27] In the report of Appellants' expert, Mr. Kevin P. Byers, that is a part of the record,[28] he discusses how the proximity of the loan at issue to the passage of the West Virginia

Predatory Lending Law[29] suggests opportunistic fee charging.[30] While we note that this evidence of allegedly excessive fees could not be used to establish a claim under the West Virginia Predatory Lending Law that did not take effect until after the loan transaction at issue transpired, such evidence can properly be considered in connection with Appellants' claim of unconscionability.[31]

As to the trial court's finding that the record is devoid of evidence demonstrating that the appraisal performed by Ms. Westfall was either fraudulent or that she misrepresented the true market value of the Herrods' home, we find evidence that clearly suggests an inflated appraisal of the home. When the Herrods were having trouble meeting their mortgage payments, they attempted to place their home on the market and learned that it was only likely to be listed in the $70,000 to $75,000 range. The deposition testimony of

25. While the yield spread premium is not directly paid by the consumer, the consumer does incur additional costs throughout the life of the loan because of the increased percentage rate at which the loan is granted. As Appellants' expert, Kevin P. Byers, explained in his report: "Actual compensation paid to broker First Security on the Herrod loan ... includes $6,600 [broker fee and loan origination fee] in fees alone, all of which were financed into the loan. The yield spread added $3,304 in additional fees to First Security, paid by the Herrods through a higher note rate, bringing total compensation to $9,904.00, or roughly 10.5% of the loan amount...."

26. See 15 U.S.C. § 1602(aa)(1)(B) (2000) (recognizing that loan is covered by federal Home Ownership and Equity Protection Act where upfront finance charges exceed 8% of "total loan amount"). Effective July 1, 2000, West Virginia enacted its own predatory lending law which prohibits the charging of cumulative loan fees in excess of 6% of the loan amount, including any yield spread premium. See W.Va.Code § 31–17–8(m)(4) (2002) (Repl. Vol. 2003).

27. While Washtenaw takes the position that the record only contains this evidence by virtue of a consent decree that post-dates the entry of the summary judgment ruling at issue, the report of Appellants' expert, Mr. Kevin P. Byers, which is a part of the record considered by the trial court because it is attached as an exhibit to the findings of fact and conclusions of law expressly required by the trial court, clearly sets forth the factual basis for the loan buy back by explaining the adoption of the Fannie Mae policy on April 11, 2000, regarding excessive fees. See Haga v.

King Coal Chevrolet Co., 151 W.Va. 125, 132, 150 S.E.2d 599, 603 (1966) (holding that upon motion for summary judgment all exhibits and affidavits and other matters submitted by both parties should be considered). Furthermore, the affidavits submitted in support of Fannie Mae's motion for summary judgment clearly document the selling of the loan by Fannie Mae following the filing of the Herrods' lawsuit. Because the non-moving party is entitled to inferences from the evidence on a motion for summary judgment, the evidence clearly suggests that the buy back was initiated by Fannie Mae because of the excessive fees charged to the Herrods. See Cavender v. Fouty, 195 W.Va. 94, 464 S.E.2d 736 (1995) (recognizing that non-movant is entitled to benefit of inferences on summary judgment motion).

28. See supra note 27.

29. See supra note 26.

30. Mr. Byers states: "The opportunistic and excessive nature of the First Security charges appear that much more egregious in light of the timing of the Herrod closing given that First Security would be prohibited by state law from such profiteering at the expense of borrowers within nine weeks of the closing." In his report, Mr. Byers also concludes that the loan was a "predatory loan" based on the fees charged under the guidelines established by Fannie Mae.

31. The trial court appears to have placed undue emphasis on the lack of a law in effect at the time of the closing that capped mortgage broker fees.

the Herrods indicates that they discovered that their house was worth at least $20,000 less than the amount for which it was mortgaged. In addition, Mrs. Herrod testified that two of the four comparables used in the appraisal performed by Ms. Westfall were homes in Bridgeport, where the real estate market is purportedly higher than in Clarksburg.[32] The record also contains documentation that Ms. Westfall entered into a consent decree with the Licensing and Certification Board of the West Virginia Real Estate Appraiser based on the Board's finding of reasonable cause to believe she had deviated from "generally accepted standards of professional appraisal practices as they relate to geographic competency in connection with the valuation of certain real property."[33] When all of these factors are viewed together and the permissible inferences from such evidence considered, we would be hard pressed not to find error with the trial court's finding that the appraisal prepared in connection with the Herrod residence by Ms. Westfall was an accurate reflection of the market value of such home.

Upon our review of the record, we are compelled to conclude that genuine issues of material fact preclude an award of summary judgment to Washtenaw on the Herrods' claim that the loan at issue is unconscionable. Given that these claims are highly fact dependent and that the record, when viewed in the light most favorable to the Herrods, clearly presents issues of fact concerning the "gross inadequacy in bargaining power" and the "existence of meaningful alternatives available to the plaintiffs," we reverse and remand on this issue of unconscionability. *Hager*, 37 F.Supp.2d at 786–87.

### B. Credit Services Organization

■ The trial court concluded that Washtenaw was entitled to summary judgment on the Herrods' claim that First Securities failed to comply with the credit services organizations ("CSO") provision of the West Virginia Consumer Credit and Protection Act (the "Act").[34] Under West Virginia Code § 31–17–8(k), it is provided that

[n]o licensee shall charge a borrower or receive from a borrower money or other valuable consideration as compensation before completing performance of all services the licensee has agreed to perform for the borrower unless the licensee also registers and complies with all requirements set forth for credit service organizations in article six-c [§§ 46A–6C–1 et seq.], chapter forty-six-a of this code....

In *Brown v. Mortgagestar, Inc.*, 194 F.Supp.2d 473 (S.D.W.Va.2002), the district court held that the CSO provisions of the Act will only apply to a mortgage broker if that mortgage broker charges or receives money from the borrower before completing performance of all services that the mortgage broker has agreed to perform for that borrower. *Id.* at 476, n. 4. The district court further determined that where the broker fee is paid at the loan closing, the CSO provisions are inapplicable. *Id.* Applying *Brown*, the trial court concluded that because First Securities did not collect a fee from the Herrods prior to the loan closing it was not required to comply with the CSO provisions of the Act.

The Herrods were seeking to rely on the Act to hold Washtenaw liable for the alleged failure of First Security to provide the Herrods with a copy of a broker agreement setting forth their fees and a right to cancel the agreement.[35] The trial court ruled that

---

**32.** Ms. Westfall testified to the use of the non-Clarksburg comparables in performing the appraisal and further acknowledged that some of the homes used for comparison purposes had square footage amounts much larger than the Herrods' home.

**33.** Through the decree that was signed on July 3, 2002, Ms. Westfall agreed to pay the $500 costs of the investigation; take a 15 hour course on the sales comparison approach; and to abide by the rules of the Board as well as applicable state laws. The decree indicates that Ms. Westfall

does not admit to having deviated from generally accepted appraisal practices.

**34.** *See* W.Va.Code § 46A–6C–1 to –12.

**35.** In the summary judgment ruling at issue, the trial court expressly found that the Herrods signed various disclosure documents in which "First Security disclosed all aspects of the proposed loan transactions, including First Security's role as a broker, its services, and its compensation." As indicated previously, the Herrods appear to complain about the fact that they were

even if First Security was required to comply with the CSO provisions of the Act, "there is no legal duty or obligation which requires Washtenaw to ensure First Security's compliance with the CSO Provisions of the WVCCPA [the Act]." We agree. Because there is no basis for imposing liability on Washtenaw under this theory, we affirm the trial court's grant of summary judgment on this issue.

### C. Fraud

■ On this issue, the trial court granted summary judgment to Washtenaw based upon its conclusion that the "Herrods have produced no eviden[ce] to support any allegation that Washtenaw induced any fraudulent act or acts by one or more of the other defendants in this civil action." The trial court further found that "[t]here could not have been any fraudulent act committed by Washtenaw upon which the Herrods relied in entering into the loan which is at issue in this civil action because the Herrods did not have any contact with Washtenaw until after the loan closing."

While the Herrods assert abundant evidence of fraud with regard to this case, all of the factual assertions they refer to involve the actions of Mr. Young and First Securities. The alleged fraudulent representations all pertain to Mr. Young's statement that he would get them the best rate he could and that he cut his fees to do the loan at the time of the signing. The Herrods maintain that they would not have signed the loan if they had known they were not getting the best rate possible. None of these allegations of fraud in the inducement involve Washtenaw. Consequently, we find no error with regard to the trial court's dismissal of the Herrods' claim predicated on fraud as against Washtenaw.

### D. Unfair and Deceptive Acts and Practices

Through their complaint Appellants sought to have the use of a yield spread premium declared illegal as an unfair and deceptive act or practice under the Act. Finding no provi-

sion in the Act addressing the use of such yield spread premiums, the trial court determined that such a claim would have to be asserted under federal law under the Real Estate Settlement Procedures Act ("RESPA"). *See* 12 U.S.C. § 2607 (2000). Then the court ruled that to the extent the Herrods were asserting such a claim, it was time-barred by the one-year statute of limitations that applies to claims brought under RESPA. The trial court similarly found that Appellants' assertion of a claim for allegedly not receiving a good faith estimate of settlement costs was a claim under federal law and one for which there is no private right of action. *See* 12 U.S.C. § 2604(c) (2000); *Collins v. FMHA–USDA*, 105 F.3d 1366 (11th Cir. 1997).

■ In defense of their claim, Appellants argue that they did not pursue federal claims but sought to have such procedures declared illegal under our state consumer credit and protection act. The prohibited conduct that is set forth in the CSO provisions of the Act clearly does not extend to or prohibit the use of yield spread premiums as it is currently written. *See* W.Va.Code § 46A–6C–3. And as the trial court found, even if First Securities was required to comply with the CSO provisions of the Act that identify illegal charges, "there is no legal duty or obligation which requires Washtenaw to ensure First Security's compliance with the CSO Provisions of the WVCCPA [the Act]." Finding no language in the Act which makes the use of yield spread premiums illegal or which would impose liability for a broker's violation of the Act on a lender, we must agree with the trial court that summary judgment is warranted on this claim for unfair and deceptive practices.

### E. Joint Venture, Agency or Conspiracy

■ The Herrods contend that Washtenaw had an agreement with First Security with regard to obtaining loans like the one which the Herrods signed that involved the use of the yield spread premium as a so-called kickback to reward the broker for

---

allegedly not provided with copies upon signing some of these documents. Because some of the documents were mailed to the Herrods, *see supra*

note 9, they obviously had possession of several of the documents they signed.

obtaining the loan. The trial court granted summary judgment to Washtenaw on this count, finding that there was no evidence that it was "involved in any joint venture, conspiracy and/or agency with any of the other defendants in this civil action." Appellants argue that "the question of whether or not a joint venture exists is to be answered by the jury" and further that " '[a] plaintiff has a right to a jury trial upon the factual issues to determine whether a joint venture existed.' " *Bowers v. Wurzburg*, 207 W.Va. 28, 37, 528 S.E.2d 475, 484 (1999) (quoting *Lasry v. Lederman*, 147 Cal.App.2d 480, 305 P.2d 663 (1957)).

While we agree that the evidence in the record on this issue is inferential at best, the Appellants' expert does set forth various theories in his report as to how the loans were approved and the involvement of other parties. The Herrods allege that there was an arrangement between Washtenaw and First Security with regard to the exchange of loan information and terms that was instrumental in the securement of the loan at issue.[36] Through these allegations of joint venture, agency, and conspiracy, the Herrods seek to impose liability on Washtenaw for any wrongdoing that they are able to prove against First Security.

In the report prepared by Appellants' expert witness that is part of the record, Mr. Byers opines that "a close inspection of the underwriting documents in the Washtenaw document file indicate that First Security worked hand-in-glove with them on the processing and approval of the Herrod loan from very early in the application process." He explains further:

> Washtenaw's own internal documents show a submission date to Washtenaw by First Security of April 20, 2000, yet the Desktop Underwriter system notes on April 19, 2000 that Washtenaw submitted the loan package for approval by Fannie Mae. In

my opinion, First Security worked with their own version of Desktop Underwriter, or one supplied by Washtenaw, and pulled the Herrod credit reports through this system. At some point, however, either First Security processed the Herrod loan application through Desktop Underwriter in Washtenaw's name and using their lender identification in Fannie Mae's system, or Washtenaw was involved in the processing of the Herrod loan much earlier than their internal underwriting documents indicate. Given Earl Young's deposition testimony that 90% of First Security's Fannie Mae loans were brokered to Washtenaw, it is highly likely they processed the loan in Washtenaw's name.

He continues:

> The implications of this processing for the Herrods gets back to the April 6, 2000 Good Faith Estimate mailed by Earl Young of First Security, and the very specific yield spread premium noted on this form. I mentioned earlier that Mr. Young would need a lender rate sheet to calculate such a specific yield spread, and the Desktop Underwriter processing by First Security through Washtenaw would be a logical extension of an April 6, 2000 yield spread pricing based on rate sheets provided to First Security by Washtenaw. While this may be a good business arrangement to close deals and maximize profit for the broker and lender, for the Herrods it meant the pricing fix was in long before they ever had any idea they were approved for a loan.

While this report of Appellants' expert appears to be the sole evidence of an arrangement between First Security and Washtenaw with regard to loan approval, we conclude that it should be up to a jury to determine whether there is sufficient evidence of a joint venture, agency, or conspiracy between these parties.

---

**36.** Appellants contend that First Security would enter information into their computer regarding the prospective borrowers that would simultaneously be transmitted to Washtenaw and that the software being utilized would in turn provide disclosures reflecting the terms of the loan that Washtenaw would be willing to originate. The Herrods maintain that Wastenaw provided First Security with lender rate sheets and underwriting standards so that it could immediately discern and convey the loan terms to borrowers. Appellants suggest that this pattern of operation, along with the use of a "kickback" in the form of the yield spread premium, evidences a close relationship between First Security and Washtenaw.

Based on the foregoing, the decision of the Circuit Court of Kanawha County as to the granting of summary judgment to Washtenaw is affirmed as to the counts pertaining to credit services organization, fraud, and unfair or deceptive practices or acts, but reversed as to the counts pertaining to unconscionability and joint venture or conspiracy.

Affirmed, in part; Reversed, in part.

Justice BENJAMIN, deeming himself disqualified, did not participate in the decision of this case.

Judge JOHN S. HRKO, sitting by temporary assignment.

Justice DAVIS, joined by Justice MAYNARD, concurs, in part, and dissent, in part, and files opinion.

Justice STARCHER concurs and files a separate opinion.

DAVIS, J., concurring in part and dissenting in part:

(Filed Dec. 7, 2005)

In this case, the majority concluded that the circuit court was correct in granting summary judgment to Washtenaw as to the Herrod's claims alleging a failure to comply with the Credit Services Organizations provision of the West Virginia Consumer Credit and Protection Act, fraud, and unfair or deceptive practices under the West Virginia Consumer Credit and Protection Act. I concur fully with the majority opinion's resolution of these matters. I disagree, however, with the majority's reversal of summary judgment as to the Herrod's claims of unconscionability and joint venture, agency or conspiracy.

*1. Unconscionability.* The majority's analysis of the issue of unconscionability does not apply to the facts of this case. In it's analysis of this issue, the majority opinion holds that "[w]here unconscionability is asserted under West Virginia Code § 46A–2–121 (1996) (Repl. Vol. 1999), the existence of questions of fact regarding *whether the bargaining power was grossly unequal* and

thereby rendered the transactions between the plaintiffs and defendants unconscionable precludes the resolution of such claims through summary judgment." Syl. pt. 4, in part (emphasis added). The majority goes on to discuss the inequality between the bargaining positions of the Herrod's as compared to First Security. While there may indeed have been such a disparity, this analysis is irrelevant to the instant appeal as there were no issues pertaining to First Security presented to this Court. The *only* defendant remaining in this case is Washtenaw.[1] There is simply no evidence in this case that Washtenaw engaged in any bargaining with the Herrods. Rather, as the majority opinion plainly acknowledges, the bargaining occurred between the Herrods and First Security. Although Washtenaw was the lender in this case, it simply had no direct contact with the Herrods. Because there was absolutely no bargaining between the Herrods and Washtenaw, the Herrod's claim of unconscionability against Washtenaw simply cannot stand. For this reason, I strongly believe the circuit court was correct in granting summary judgment to Washtenaw on this claim.

*2. Joint Venture, Agency or Conspiracy.* The only evidence to support the Herrod's claims of a joint venture, agency or conspiracy was the opinion of the Herrod's expert witness, which was entirely speculative. Indeed, the majority itself concedes that "the evidence in the record on this issue is inferential at best ...." Maj. op. at 338, 625 S.E.2d at 338. In finding that the circuit court erred in granting summary judgement on this issue, the majority ignores the fact that this Court has long recognized the requirement for a minimum level of evidence to overcome a motion for summary judgment. With respect to the burden placed on the non-moving party in order to overcome a proper motion for summary judgment, we have held that

If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that

1. *See* Maj. op. at 357 n. 1, 625 S.E.2d at 357 n. 1 ("Washtenaw is the only remaining defendant of the various individuals and businesses that were sued by the Herrods after settlement and dismissals as a result of previous summary judgment rulings.").

there is no genuine issue of a material fact, the burden of production shifts to the non-moving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.

Syl. pt. 3, *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329 (1995). Moreover, this Court has repeatedly observed that "the party opposing summary judgment must satisfy the burden of proof by offering more than a mere 'scintilla of evidence,' and must produce evidence sufficient for a reasonable jury to find in a nonmoving party's favor." *Painter v. Peavy,* 192 W.Va. 189, 192–3, 451 S.E.2d 755 758–59 (1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)). *Accord Toth v. Board of Parks and Recreation Comm'rs,* 215 W.Va. 51, 56, 593 S.E.2d 576, 581 (2003); *Bowers v. Wurzburg,* 207 W.Va. 28, 41, 528 S.E.2d 475, 488 (1999) (Davis, J., dissenting); *Gardner v. CSX Transp., Inc.,* 201 W.Va. 490, 497–98, 498 S.E.2d 473, 480–81 (1997); *Jividen v. Law,* 194 W.Va. 705, 713, 461 S.E.2d 451, 459 (1995). In this case, the Herrods failed to meet their burden of providing more than a mere scintilla of evidence and, therefore, it is my view that the circuit court was correct in granting summary judgment to Washtenaw on this claim.

For the foregoing reasons, I concur in part, and respectfully dissent in part, from the majority opinion. I am authorized to state that Justice MAYNARD joins me in this separate opinion.

STARCHER, J., concurring:

(Filed Dec. 16, 2005)

In the instant case, the majority has properly reversed the circuit court's grant of summary judgment to the defendant lender, and I concur in that judgment. Given the significance of the issues involved in the instant case to many West Virginia homeowners, I write separately to further address those issues.

The instant case involves a practice that is defined by the federal government as "predatory lending." *See* HUD–Treasury National Predatory Lending Task Force, Joint Report: "Curbing Predatory Home Mortgage Lending" (2000). According to this report, predatory lending involves providing a borrower a loan with limited or no benefit, often characterized by high fees, that erodes the borrower's equity through (1) deception or fraud, (2) manipulating the borrower through aggressive sale tactics, or (3) taking unfair advantage of a borrower's lack of understanding of loan terms.

As Justice Maynard explained in *Toppings v. Meritech Mtg. Servs., Inc.,* 212 W.Va. 73, 74, 569 S.E.2d 149, 150 (2002) (Maynard, J. concurring):

> Subprime lenders loan to those borrowers with past credit problems or low income at a higher cost than conventional mortgage loans.... The transformation from subprime lending to predatory lending occurs when lenders employ unethical and/or illegal tactics to secure the loans or offer subprime loans to those who qualify for prime loans.

The instant predatory lending case involves a broker, an appraiser, a lender, and at least two assignees. Washtenaw Mortgage Corp. ("Washtenaw") was the original lender in the transaction. The note and the deed of trust both bear Washtenaw's name. Washtenaw, which provided the money for the transaction, set the guidelines for the loan, set the requirements for funding the loan, and otherwise directed the activities of the broker. Washtenaw controlled the loan origination in order to protect its investment of upwards of $100,000.00. The evidence of this control is abundant in the record.

The loan officer for the broker, First Security Mortgage Corporation ("First Security"), testified that Washtenaw gave First Security rate sheets and underwriting criteria to make loans on its behalf. Plaintiff's expert also noted that Washtenaw had provided First Security software to facilitate the origination of loans. First Security was making representations to the Herrods about the loan that they would get with Washtenaw.

Conversely, Washtenaw had no employees in West Virginia. Therefore it relied solely on the broker to communicate the terms of the loan to borrowers here. The record demonstrates that this relationship between First Security, Washtenaw, and the funder of the loan, Federal National Mortgage Association ("Fannie Mae"), was not sporadic. Ninety percent of Fannie Mae loans brokered by First Security were originated through Washtenaw.

After Washtenaw originated the loan pursuant to an agreement with Fannie Mae, it assigned the note and deed of trust to Fannie Mae. The record demonstrates that Washtenaw made the loan with the intention of assigning it to Fannie Mae. The loan officer for First Security testified that he recognized the loan was a "Fannie Mae loan" even before it had ever been assigned to Fannie Mae. This scenario, wherein loans are originated by brokers at the direction of another lender and then sold shortly afterward, is a common scenario—known as "securitization" in the home loan market.

Securitization ostensibly provides a source of capital so that more home loans are available to borrowers. However, the series of corporate and banking transactions that make up securitization cannot be permitted to avoid liability by those who are actually providing the funding—and often controlling the transaction. *See* Kurt Eggert, *Held up in Due Course: Predatory Lending, Securitization, and the Holder in Due Course Doctrine*, 35 Creighton L. Rev. 503 (2002).

The partial dissent argues that the Herrods should not be able to pursue their unconscionability claim against Washtenaw because the Herrods presented no evidence that Washtenaw employees unconscionably induced the Herrods into the contract. However, the *West Virginia Consumer Credit and Protection Act* provides that a loan or any portion thereof may be voided if a court concludes that the loan was induced by unconscionable conduct *or* the loan contains unconscionable terms:

> With respect to a transaction which is or gives rise to a consumer credit sale, consumer lease or consumer loan, if the court as a matter of law finds:

> (a) The agreement or transaction to have been unconscionable at the time it was made, or to have been induced by unconscionable conduct, the court may refuse to enforce the agreement, or

> (b) Any term or part of the agreement or transaction to have been unconscionable at the time it was made, the court may refuse to enforce the agreement, or may enforce the remainder of the agreement without the unconscionable term or part, or may so limit the application of any unconscionable term or part as to avoid any unconscionable result.

*W. Va. Code*, 46A–2–121(1).

In order to obtain equitable relief under this statute, it is not necessary that the Herrods establish that in addition to unconscionable terms or inducement, *Washtenaw itself* must have engaged in affirmative acts to unconscionably induce the loan. Though the affirmative acts of a participant are relevant to the measure of additional damages recoverable from a particular party, *W. Va. Code*, 46A–5–101(1), the identity of the party or parties who entered into an unconscionable agreement is not a determining fact for entitlement to equitable relief.

Additionally, it is apparent from the record, that with respect to the Herrods' unconscionability claim, Washtenaw is not without blame. Among other things, the Herrods claim the fees in the loan were unconscionable. Washtenaw was a signatory to the contract and clearly was aware that the fees (1) were on their face excessive; (2) rendered the loan a high cost loan under federal law; and (3) violated its agreement not to originate loans for assignment to Fannie Mae that contained more than 5% in fees.

As the majority correctly concludes, there was substantial evidence already in the record, and the Herrods were entitled to an opportunity to present that evidence in support of their unconscionability claim. Indeed, in contrast to virtually all other types of claims, the statute mandates an opportunity to fully present evidence. *See W. Va. Code*, 46A–2–121(2).

The circuit court found that summary judgment was appropriate in favor of Wash-

tenaw on the illegal mortgage solicitation claim under the Credit Services Organization Act, on the basis that the broker did not collect a fee prior to the extension of credit. The majority concludes, correctly, that there is nothing in section 46A–6C–1 *et seq.* that requires lenders to comply with the CSO provisions of the Act.

However, the trial court went further, and suggested that not even First Security was required to comply with the CSO provisions. This Court's holding simply states that lenders are not bound by the CSO provisions of the *West Virginia Consumer Credit and Protection Act. Accord, Brown v. Mortgagestar, Inc.,* 194 F.Supp.2d 473, 476 (S.D.W.Va. 2002) (lenders are exempt).

This Court's holding should not be misinterpreted to suggest that brokers, who have heretofore been bound by the CSO provisions, are not covered by the Act. *See Arnold v. United Companies Lending Corp.,* 204 W.Va. 229, 238, 511 S.E.2d 854, 863 (1998). There is nothing in the language of the statute that exempts brokers. Section 31–17–8(k) simply states that brokers cannot accept a fee until they have complied with the CSO provisions. It does not say that *only* when fees are paid prior to closing are brokers subject to the Act.

Furthermore, it is axiomatic that to be bound for payment of broker fees for services rendered, borrowers must have signed and received a written contract that provides the nature of the services to be provided and the cost of the services. *See generally W. Va.Code,* 46–2–201. In the instant case, the broker obtained over $10,000.00 in fees. Borrowers certainly have a right to a written contract when deciding whether to purchase such services; and if they do, to receive a copy of the written agreement for services costing them over $10,000.00.

In discussing the question of fraud and misrepresentation, the dissenting and the circuit court focused on an asserted lack of direct evidence of any direct misrepresentations by Washtenaw. This case, however, concerns whether Washtenaw can use brokers who do engage in fraud, suppressions, and misrepresentations to induce borrowers into predatory loans—and then enforce the predatory loans against the borrowers.

There appears to be some confusion in the dissent and the circuit court's opinions between the concepts of fraudulent misrepresentation as a defense to contract, and the concept of fraud as a tort. The Restatement (Second) of Contracts notes the difference between fraud as a contractual defense and fraud as a tort:

> A misrepresentation is an assertion that is not in accord with the facts. Concealment, and in some cases non-disclosure of a fact are equivalent to such an assertion. A misrepresentation may have three distinct effects under the rules stated in this Chapter. First, in rare cases, it may prevent the formation of any contract at all. Second, it may make a contract voidable. Third, it may be the grounds for a decree reforming the contract. In the case of non-disclosure by a fiduciary, making a contract with his beneficiary, these rules are supplemented by the rule stated in § 173.
>
> *A misrepresentation may also be the basis for an affirmative claim for liability for misrepresentation under the law of torts.* Such liability for misrepresentation is dealt with in the Restatement, Second, Torts. See Restatement, Torts chs. 22, 23. The rules stated there conform generally to those stated here. However, because tort law imposes liability in damages for misrepresentation, while contract law does not, the requirements imposed by contract law are in some instances less stringent. Notable, under tort law a misrepresentation does not give rise to liability for fraudulent misrepresentation unless it is both fraudulent and material, while under contract law a misrepresentation may make a contract voidable if it is either fraudulent or material.

Restatement (Second) Contracts ch. 7, Introductory Note (1981) (citations omitted) (emphasis added).

The question of whether a party was fraudulently induced into a contract may go to the formation of the contract. A party that is misled as to the essential terms of a contract does not technically agree to the

contract, as no assent to its terms has been formulated due to the misrepresentation. In this situation, it is irrelevant whether the misrepresentation was made by the other party to the contract or a third person. *See* Restatement (Second) Contracts § 163 (1981) ("It is immaterial under the rule stated in this Section whether the misrepresentation is made by a party to the transaction or by a third person.").

If a misrepresentation does not prevent a party from assenting to the contract, the misrepresentation, whether it be fraudulent or material, may render the contract merely voidable. *See* Restatement (Second) Contracts 164 (1981). A misrepresentation by a third party may render the contract voidable. *See id.* 164(2).

Article 3 of the Uniform Commercial Code governs the claims and defenses a party may make arising out of negotiable instruments. The UCC provides that the right to enforce an obligation arising out of a negotiable instrument is subject to "[a] claim in recoupment of the obligor against the original payee of the instrument if the claim *arose from the transaction that gave rise to the instrument*; but the claim of the obligor may be asserted against a transferee of the instrument only to reduce the amount owing on the instrument at the time the ·action is brought." *W.Va. Code,* 46–3–305 (emphasis added). Under this provision, it is clear that any claim an obligor may have arising out of the transaction may be asserted defensively against the original payee in the transaction in an action for recoupment.

To the extent that borrowers are defrauded, as a matter of contract law, they have defenses against the holder of the obligation in an action for recoupment.[1] There is no basis for Washtenaw to wipe out the Herrods' contractual defense of fraud, regardless of whether the fraud was directly induced by a third person.

A securitization model—a system wherein parties that provide the money for loans and drive the entire origination process from afar and behind the scenes—does nothing to abolish the basic right of a borrower to assert a defense to the enforcement of a fraudulent loan, regardless of whether it was induced by another party involved in the origination of the loan transaction, be it a broker, appraiser, closing agent, or another.

Thus, the Herrods may assert these equitable claims in recoupment. Moreover to the extent the Herrods can prove that Washtenaw was engaged in a joint venture, agency, or conspiracy with the broker and/or appraiser, they may pursue their actual and punitive damages under tort theories. *See Muzelak v. King Chevrolet,* 179 W.Va. 340, 345, 368 S.E.2d 710, 715 (1988); Restatement (Second) Contracts, ch. 7, Introductory Note (1981).

In this case, the Herrods presented substantial evidence that they were fraudulently induced into the loan. The evidence, taken in a light most favorable to the Herrods, tended to show the broker and the appraiser had an arrangement—arguably a conspiracy—to provide inflated appraisals to justify predatory loans. The evidence of this scheme was sufficient enough for the circuit court to deny summary judgment to the appraiser.[2] While the Herrods have produced no evidence to hold Washtenaw directly liable for fraud as a tort, they nonetheless have the ability to maintain an action for recoupment for fraudulent misrepresentation in contract, and for damages in joint venture, conspiracy, or agency, as explained by the Opinion of the Court.

The Herrods also allege the broker engaged in unfair and deceptive acts or practices in the origination of the loan in violation of *W.Va.Code,* 46A–6–101 *et seq.* These claims were made against the broker, not the

---

**1.** Since a lender in this state may foreclose on property without a judicial proceeding, *see W.Va. Code* 38–8–1 *et seq.,* a borrower who wants to avoid foreclosure and seek other relief must initiate a new civil action.

**2.** The broker, First Security, abandoned its defense during the litigation and apparently was facing a default judgment when summary judg-

ment was entered for Washtenaw. The Appellants claim that several of the issues for which Washtenaw received summary judgment were actually claims exclusive to the broker. This Court apparently did not consider the legitimacy of any claims that were asserted only against the broker, who was not a party to this appeal.

lender. To be sure, the UDAP provisions do not apply to lending activities, but only apply to the sale of services—in this case, broker services. *See W.Va.Code,* 46A–6–102(d). I agree with the majority that the Herrods asserted no claims for unfair and deceptive acts or practices against Washtenaw. This Court has not passed on the Herrods' UDAP claims, to the extent they may be asserted against the broker in connection with the sale of broker services.

The Opinion of the Court also affirms the right of the Herrods to pursue liability against Washtenaw for any wrongdoing that they are able to prove against the broker.

Though direct claims for fraud, failure to provide a proper broker agreement, and UDAP were properly dismissed, actual and punitive damages may nevertheless be pursued against the lender. Participation in a joint venture with a broker or other party in a predatory lending context gives rise to liability for such claims under a claim of joint venture. *See Short v. Wells Fargo Bank Minnesota, N.A.,* 401 F.Supp.2d 549, 564–65 (S.D.W.Va.2005); *see also generally Armor v. Lantz,* 207 W.Va. 672, 677–78, 535 S.E.2d 737, 742–43 (2000); *Sipple v. Starr,* 205 W.Va. 717, 725, 520 S.E.2d 884, 892 (1999); *Price v. Halstead,* 177 W.Va. 592, 594, 355 S.E.2d 380, 384 (1987).

Similarly, if one party is directing or exercising control over loan origination in the circumstance of securitized lending, it is a factual question as to whether there is a principal/agency relationship sufficient to impose such liability on all the participants. *See Short v. Wells Fargo Bank Minnesota, N.A., supra,* 401 F.Supp.2d at 564–65; *England v. MG Investments, Inc.,* 93 F.Supp.2d 718, 723 (S.D.W.Va.2000); *Arnold,* 204 W.Va. at 240, 511 S.E.2d at 865.

The dissent contends that the Herrods presented no more than a scintilla of evidence in support of their claims for joint venture, agency, and conspiracy. While the Opinion of the Court states that the evidence presented by the Herrods was inferential, this by no means suggests that the evidence was not sufficient for a jury to find there was a relationship between Washtenaw and the broker. This Court has previously held " '[p]roof of an express contract of agency is not essential to the establishment of the relation. *It may be inferred from facts and circumstances,* including conduct.' " *Arnold,* 204 W.Va. at 239, 511 S.E.2d at 864 (quoting *General Elec. Credit Corp. v. Fields,* 148 W.Va. 176, 181, 133 S.E.2d 780, 783 (1963)) (emphasis added).

Indeed, it would defy common sense to suggest that there was no relationship between the broker and the lender in this case. Washtenaw had no employees in this State. Its only ability to communicate with the Herrods was through the broker. The loan broker testified and the Herrods' expert explained that Washtenaw provided First Security with rate sheets, underwriting criteria, and software to facilitate the broker's origination of loans for Washtenaw. Washtenaw directed the broker in all aspects of the loan. It would be surprising if Washtenaw did not control all details of the origination of the loan considering Washtenaw's considerable investment.

And finally, there was evidently an agreement to share in the profits in the loan. In addition to significant up-front fees that presumably would not be paid if the loan were not closed, Washtenaw paid First Security a yield spread premium, which was tied directly to the rate the broker persuaded the Herrods to take. While all this evidence may be termed as "inferential," it certainly was more than a "scintilla." On the other hand, the only evidence presented in contradiction of the Herrods' evidence was that First Security had a broker relationship with other lenders. At the very least there exists a fact issue for the jury on the Herrods' joint venture, agency, and conspiracy claims.

Accordingly, I concur.